Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

## 2023 CO 10

**No. 22SA254, *People v. Willoughby* — Criminal Law — *Miranda* — Custody.**

Officers arrived at the defendant's apartment to investigate allegations of domestic violence. The defendant refused to come outside or leave his apartment, and instead he spoke to the officers from his second-story balcony while the officers remained on the ground below. While still outside, an officer told the defendant that he was under arrest three times. The defendant did not yield to the officers' authority. The defendant later stated that he had exculpatory evidence inside his apartment, which he offered to show one of the officers. The officer responded, "I'm not gonna lie to you and tell you you're not going to jail," and "[i]f you're voluntar[ily] willing to let us go in there and look, and it proves your side of the story, then it will probably change you going to jail, but I'm not going to tell you one way or another." The defendant then allowed the officer inside and made incriminating statements. Later, the defendant moved to suppress the statements, arguing they were obtained in violation of his Fifth Amendment right

against self-incrimination. The trial court agreed with the defendant that he was in custody when he made the incriminating statements.

The supreme court now holds that the defendant was not in custody for *Miranda* purposes. Applying the factors from *People v. Matheny*, 46 P.3d 453, 465–66 (Colo. 2002), the court concludes that, under the totality of the circumstances, a reasonable person in the defendant's position would not believe their freedom of movement was restricted to the degree associated with a formal arrest. Thus, the court reverses and remands.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

---

## 2023 CO 10

---

### Supreme Court Case No. 22SA254
*Interlocutory Appeal from the District Court*
Boulder County District Court Case No. 21CR1741
Honorable Dea M. Lindsey, Judge

_____

### Plaintiff-Appellant:

The People of the State of Colorado,

v.

### Defendant-Appellee:

Brent A. Willoughby.

_____

### Order Reversed
*en banc*
March 6, 2023

_____

**Attorneys for Plaintiff-Appellant:**
Michael T. Dougherty, District Attorney, Twentieth Judicial District
Ryan P. Day, Senior Deputy District Attorney
   *Boulder, Colorado*

**Attorneys for Defendant-Appellee:**
Megan A. Ring, Public Defender
Emily S. Briggs, Deputy Public Defender
   *Boulder, Colorado*



**CHIEF JUSTICE BOATRIGHT** delivered the Opinion of the Court, in which **JUSTICE HOOD, JUSTICE HART**, and **JUSTICE SAMOUR** joined. **JUSTICE BERKENKOTTER**, joined by **JUSTICE MÁRQUEZ** and **JUSTICE GABRIEL**, dissented.

CHIEF JUSTICE BOATRIGHT delivered the Opinion of the Court.

¶1     Police officers interrogated Brent A. Willoughby at his home about domestic violence allegations.  After the People charged Willoughby with several offenses, he moved to suppress the statements he made during this interrogation, arguing that the officers obtained them in violation of *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  The trial court granted the motion, finding that Willoughby had been subjected to a custodial interrogation without first receiving *Miranda* warnings.

¶2     The People filed this interlocutory appeal, challenging the trial court's suppression order.  We hold that Willoughby was not in custody for *Miranda* purposes when he made the statements at issue.  Therefore, we reverse the portion of the trial court's order suppressing the statements and remand the case for further proceedings consistent with this opinion.

## I.  Facts and Procedural History

¶3     Four Longmont police officers arrived at Willoughby's apartment around 6:15 p.m., during daylight hours, in uniform and carrying their service weapons.[1]

---

[1] We derive the following observations from our review of one officer's body camera footage, which shows the officers arriving at the scene, their exchanges with Willoughby, and his eventual arrest.  *See People v. Kutlak*, 2016 CO 1, ¶ 13, 364 P.3d 199, 203 (noting that where there is an audio-visual record and there are no disputed facts outside the recording controlling the issue of suppression, this court sits in a similar position as the trial court and therefore may independently review the recording).

The officers were following up on a report that Willoughby's girlfriend, K.M., made to Officer Chrystie Wheeler. K.M. alleged instances of domestic violence: that Willoughby had assaulted her; sent her threatening text messages; and damaged several items of her property, including pieces of artwork.

¶4 Upon the officers' arrival, Willoughby didn't answer his door and instead began speaking to the officers from his second-story balcony while they remained on the ground below. Officer Wheeler told Willoughby about K.M.'s allegations and asked follow-up questions about the location of K.M.'s property. About one-and-a-half minutes into the encounter, Officer Wheeler told Willoughby, "Brent, you have two choices: You can come downstairs . . . or I get a warrant for your arrest." She repeated the same ultimatum about a minute later. Willoughby denied K.M.'s allegations and remained on his balcony.

¶5 Willoughby then spoke to Officer Cooper Arvisais about his relationship with K.M., claiming that she was addicted to alcohol and drugs.[2] Officer Arvisais maintained a calm tone throughout this conversation, telling Willoughby, "I get

---

[2] We note that Willoughby constantly talked throughout this interaction, continually stating his version of the events and denying the officers' allegations. It is difficult to succinctly describe these statements because it was not a conversation but rather a narrative, with Willoughby consistently interrupting Officer Arvisais.

4

that, man"; "I think we've all been there a little bit"; and "it sounds like you have a pretty tough relationship."

¶6 About fifteen minutes into the encounter, while Willoughby remained out of the officers' reach on his second-story balcony, Officer Arvisais said, "Brent, at this time you are under arrest for criminal mischief and domestic violence." Willoughby told the officers, "You can go get a warrant and come back." Officer Arvisais immediately reiterated, "So at this time you are under arrest, and we are going to apply for the warrant." Upon hearing this, Willoughby became emotional and repeatedly asked Officer Arvisais, "What did I do?" Officer Arvisais repeated the allegations and, for a third time, stated that Willoughby was under arrest: "We are going to take you to jail. You're under arrest."

¶7 Willoughby then claimed that the property K.M. alleged he had destroyed actually belonged to him. Willoughby offered to show Officer Arvisais his art equipment to prove ownership of the property. Officer Arvisais asked Willoughby, "Are you willing to let me come in and look at it?" Then the following exchange took place:

Willoughby:      If I let you in—okay, let's talk.

Officer Arvisais:   Sure, we can talk.

Willoughby:      I'll let you in.

Officer Arvisais:   Okay. I appreciate that.

| | |
|---|---|
| Willoughby: | Does that mean I'm going to jail? . . . |
| Officer Arvisais: | I'm not gonna lie to you and tell you you're not going to jail. . . . If you're voluntar[ily] willing to let us go in there and look, and it proves your side of the story, then it will probably change you going to jail, but I'm not going to tell you one way or another. |
| Willoughby: | Okay, let's do this. Will you come up, yourself? |
| Officer Arvisais: | I will, but I need a partner— |
| Willoughby: | I won't hurt you, bro. I'm not that type of fella. I love you guys in blue. . . . |
| Officer Arvisais: | Brent, breathe. You gotta listen to me. Take a breath, okay. Take a breath. I'm willing to go in the apartment, but I need my partner to stand at the door with the doorway open. |

¶8     Willoughby then gave Officer Arvisais permission to enter, opening the door while crying and saying, "Please don't arrest me, sir." After letting him in, Willoughby showed his artwork to Officer Arvisais, and they discussed Willoughby's guitar and how he learned to play. Willoughby moved and paced around the apartment, picking up various objects and showing them to the officers.

¶9     While inside the apartment, Officer Arvisais's tone of voice remained calm. Throughout the encounter, Officer Arvisais remained a few feet from Willoughby and did not touch him. Officer Arvisais asked Willoughby if he would like a glass of water to help him calm down and told him to take a breath. When Officer

6

Arvisais noticed that Willoughby was beginning to break down emotionally, he made efforts to de-escalate the situation by asking Willoughby questions about his hobbies, like what kind of guitar he owned and what instruments his father played. Willoughby was visibly upset throughout the interaction and eventually asked Officer Arvisais if he could sit down. Officer Arvisais responded, "Yeah man, you're free to have a seat," and asked Willoughby for permission to conduct a protective sweep of the sofa, which he then performed. Officer Arvisais also asked Willoughby for permission to "check around" and "turn some lights on."

¶10 After Willoughby sat down, Officer Arvisais asked Willoughby whether Officer Wheeler could come into the apartment. Willoughby consented, and Officer Wheeler entered the apartment while the third officer remained at the door.[3] Officer Wheeler began speaking with Willoughby, saying, "[T]ell me about the shadow box . . . that you broke. You sent [K.M.] a text message. And then you said 'your car is next.' Can you tell me about that?" Willoughby responded, "[S]ometimes I just try to get her pissed off to where she comes home."

¶11 While Willoughby and Officer Wheeler spoke, Officer Arvisais continued to seek Willoughby's permission to look around the apartment, asking if he could

_____

[3] Although four officers initially reported to the scene, it is not clear where the fourth officer was at this time.

7

look through a garbage bag on the balcony. Willoughby responded, "No, no, that's just trash." Officer Arvisais responded, "Okay," and didn't search the bag.

¶12 Still emotional, Willoughby described his concerns about K.M.'s health to the officers. Officer Wheeler then asked Willoughby again about the text messages that he allegedly sent to K.M., to which he responded, "I'm gonna smoke my cigar. I just—I need to smoke my cigar." Officer Arvisais then told Officer Wheeler to "just give [Willoughby] a second," and the officers waited while he smoked his cigar. About one-and-a-half minutes later—and approximately seven minutes after Officer Arvisais entered the apartment—the officers formally arrested Willoughby. The entire interaction, from the officers' arrival to the arrest, lasted less than thirty minutes.

¶13 Ultimately, the People charged Willoughby with criminal extortion, second-degree assault, unlawful sexual contact, third-degree assault (two counts), harassment, and criminal mischief. Willoughby pleaded not guilty and moved to suppress the statements he made to the officers while inside his apartment, arguing that police had subjected him to a custodial interrogation without providing the required *Miranda* warnings.

¶14 Following a hearing, the trial court concluded that Willoughby was in custody when he made the statements to the officers in his apartment. Specifically, the trial court relied on the following facts:

8

- Officer Arvisais told Willoughby that he was under arrest three times;

- Officer Arvisais spoke with Willoughby about why he was under arrest;

- Officer Arvisais told Willoughby that he wasn't going to "lie" to Willoughby and say he was "not going to jail"; and

- Officer Arvisais told Willoughby that he couldn't promise that anything Willoughby showed the officers would keep him from going to jail.

¶15     The trial court further found that once they entered the apartment, the officers did not make statements to Willoughby that would have terminated formal custody. The court reasoned that although the officers did not place Willoughby in physical restraints or prevent him from moving around the apartment, Willoughby nevertheless "was aware that [another officer] was standing at his front door, the only known exit to [his] apartment." The trial court thus concluded that "a reasonable person would believe that their movement was restricted and that they [were] unable to leave." Accordingly, the court granted Willoughby's motion to suppress.

¶16     The People then brought this interlocutory appeal.[4]

---

[4] The People certified that this appeal was not taken for purposes of delay and that Willoughby's statements to police are a substantial part of the proof of the charges against him, as required by section 16-12-102(2), C.R.S. (2022), and C.A.R. 4.1(a).

9

## II. Analysis

¶17 We begin by describing the appropriate standard of review. We next discuss the applicable law relating to custody for *Miranda* purposes. Then, we apply this law to the facts before us and conclude that Willoughby was not in custody when he made the statements at issue. Accordingly, we reverse the portion of the trial court's order suppressing the statements and remand for further proceedings consistent with this opinion.

### A. Standard of Review

¶18 A trial court's determination that an individual was in custody for purposes of *Miranda* presents a mixed question of law and fact. *People v. Padilla*, 2021 CO 18, ¶ 14, 482 P.3d 441, 445. We defer to the trial court's factual findings when there is competent evidence in the record to support them. *People v. Kutlak*, 2016 CO 1, ¶ 13, 364 P.3d 199, 203. We review the legal effect of those facts de novo. *Id.* However, we may also rely upon undisputed facts in the record and "independently review audio-recorded interrogations." *Padilla*, ¶ 14, 482 P.3d at 445.

### B. Law Relating to Custody for *Miranda* Purposes

¶19 The Fifth Amendment to the U.S. Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect this privilege, officers must provide certain warnings

to individuals prior to subjecting them to "custodial interrogation."[5] *Miranda*, 384 U.S. at 444; *see also Effland v. People*, 240 P.3d 868, 873 (Colo. 2010) ("*Miranda* protections only apply when a suspect is subject to both custody and interrogation."). Here, the People do not contest that Willoughby was interrogated, so we address only whether he was in custody.

¶20　To determine whether an individual is in custody for purposes of *Miranda*, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). This "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."[6] *Stansbury v. California*, 511 U.S. 318, 323 (1994).

---

[5] Specifically, officers must advise suspects that they have "a right to remain silent, that any statement [they do] make may be used as evidence against [them], and that [they have] a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444.

[6] The People argue that the trial court erred when it concluded that "a reasonable person would believe that their movement was restricted and that they [were] unable to leave." Specifically, the People argue that the trial court erred because this is the standard for whether someone is seized under the Fourth Amendment. *See People v. Shoen*, 2017 CO 65, ¶ 10, 395 P.3d 327, 330. We have previously stated that "[a] trial court errs by applying the 'free to leave' standard in evaluating whether a suspect is in custody under *Miranda* doctrine." *People v. Begay*, 2014 CO

11

¶21    Accordingly, courts must look to the totality of the circumstances to determine whether an individual was in custody. *Mumford v. People*, 2012 CO 2, ¶ 13, 270 P.3d 953, 957. We have provided a list of factors for courts to consider in making that determination:

> (1) the time, place, and purpose of the encounter;
>
> (2) the persons present during the interrogation;
>
> (3) the words spoken by the officer to the defendant;
>
> (4) the officer's tone of voice and general demeanor;
>
> (5) the length and mood of the interrogation;
>
> (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation;
>
> (7) the officer's response to any questions asked by the defendant;
>
> (8) whether directions were given to the defendant during the interrogation; and
>
> (9) the defendant's verbal or nonverbal response to such directions.

*Id.* (quoting *People v. Matheny*, 46 P.3d 453, 465–66 (Colo. 2002)). Although courts may consider any number of these factors, they are not exhaustive, and no single factor is determinative. *People v. Garcia*, 2017 CO 106, ¶ 20, 409 P.3d 312, 317.

---

41, ¶ 16, 325 P.3d 1026, 1030. Thus, the trial court applied the wrong legal standard and, in doing so, erred.

Additionally, it is irrelevant whether the individual is "actually arrested at the close of the interview." *Matheny*, 46 P.3d at 468 n.10.

## C. Application

¶22 With these principles in mind, we now consider whether Willoughby was in custody for *Miranda* purposes. We analyze the nonexhaustive *Matheny* factors in turn and conclude that Willoughby was not in custody when he made the statements at issue.

### 1. Time, Place, and Purpose of the Encounter

¶23 The officers arrived at Willoughby's apartment in the early evening, when it was still daylight. *Cf. People v. Davis*, 2019 CO 84, ¶ 25, 449 P.3d 732, 739 (noting that officers waking the defendant and rousing him from bed to question him weighed in favor of custody); *see also People v. Cline*, 2019 CO 33, ¶ 22, 439 P.3d 1232, 1238 (noting that an encounter that occurs during daylight weighs against custody and an encounter that takes place at night weighs in favor of custody).

¶24 The interrogation took place in Willoughby's apartment. When the encounter takes place at the individual's home or a place that is familiar to the individual, that weighs against a finding of custody. *Garcia*, ¶ 21, 409 P.3d at 317; *see also People v. Cowart*, 244 P.3d 1199, 1204 (Colo. 2010) (noting that because "the interview took place in a neutral location of [the defendant's] choice—his living room," the questioning was inherently less coercive than questioning in a police-

13

dominated setting); *Cline*, ¶ 21, 439 P.3d at 1238 ("The location of the interaction is significant.").

¶25 The purpose of the encounter was to investigate an allegation of domestic violence. When the purpose of the encounter is to elicit information from the suspect of a criminal investigation, that weighs in favor of custody. *Compare Effland*, 240 P.3d at 875 (concluding that the purpose of the encounter—to elicit information from the defendant about an ongoing investigation "for use in a criminal investigation" against the defendant—weighed in favor of custody), *with Garcia*, ¶ 27, 409 P.3d at 318 (concluding that the purpose of the encounter—a welfare check on a child—weighed against custody).

## 2. Persons Present During the Interrogation

¶26 Willoughby was alone with the officers during the interrogation. The fact that a defendant does not have a "representative or neutral party present" during an interrogation weighs in favor of custody. *See Padilla*, ¶ 23, 482 P.3d at 447.

¶27 Additionally, there were four officers at the apartment building, with two officers inside Willoughby's apartment. One officer stood outside the door, blocking the only known exit, and Willoughby knew of the officer's presence. *See Effland*, 240 P.3d at 875 (noting that an officer "was stationed outside of [the defendant's] hospital room" and the defendant "knew of the officer's presence," which weighed in favor of custody). However, the door remained open until

14

Willoughby's formal arrest. *Cf. id.* (concluding that "the investigating officers clos[ing] the door during the interrogation" weighed in favor of a custody finding).

### 3.  Words Spoken by the Officer to Willoughby

¶28    Officer Arvisais told Willoughby that he was under arrest three times. That is significant. Courts place great weight on whether police tell a suspect that they are under arrest. *Compare People v. Begay*, 2014 CO 41, ¶ 27, 325 P.3d 1026, 1032 (noting that the fact the defendant "was not told that he was under arrest" weighed against custody), *with Young v. Commonwealth*, 706 S.E.2d 53, 55 n.3 (Va. Ct. App. 2011) ("Though inconclusive by itself, the statement '*you are under arrest*' nonetheless constitutes evidence of 'an intent on the part of the arresting officer to take the person into custody and a corresponding understanding by the person arrested that he is in custody.'" (quoting *State v. Rocheleau*, 378 A.2d 1381, 1383 (N.H. 1977))); *see also United States v. Savage*, No. 07-550-06, 2012 WL 5881852, at *4 (E.D. Pa. Nov. 20, 2012) ("Being advised that you are under arrest is perhaps the most significant factor in determining that a suspect is in custody.").

¶29    This one factor, however, is not dispositive. *See Garcia*, ¶ 20, 409 P.3d at 317 ("No single factor is determinative."). It must also be noted that when Officer Arvisais told Willoughby that he was under arrest, the officers were standing outside his apartment while Willoughby remained on his second-story balcony,

15

meaning they could not physically control Willoughby or effect an arrest. *See* 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.6(f), at 833 (4th ed. 2015) ("A Court is not likely to find custody for *Miranda* purposes if the police were not even in a position to physically seize the suspect . . . ."); *see also People v. Mayfield*, 928 P.2d 485, 521 (Cal. 1997) ("[E]very court that has faced [this issue] has decided that telephone conversations between police negotiators and an armed suspect who has taken refuge *in a building that is surrounded by law enforcement officers* do not constitute custodial interrogation for purposes of the *Miranda* rule." (emphasis added)), *abrogated on other grounds by People v. Scott*, 349 P.3d 1028, 1048 (Cal. 2015).

¶30 Likely recognizing that the officers could not reach him on his balcony, Willoughby said, "You can go get a warrant and come back." Thus, Willoughby did not surrender to the officers but instead challenged their authority. Under these circumstances, Officer Arvisais's statement that Willoughby was under arrest did not actually place him under arrest. *Cf. People v. Hankins*, 201 P.3d 1215, 1217, 1219 (Colo. 2009) (holding that individual who gave statement while sitting in police vehicle, after showing officers where he hid the body of his murder victim, was not in custody because an individual's "expectation, apprehension, or knowledge of inevitable arrest are not the *Miranda* triggers; custody is").

¶31 Additionally, once the officers actually talked with Willoughby, they asked open-ended questions, and Willoughby responded in narrative form, often

16

revealing much more information than the officers' questions sought to elicit. *See People v. Sampson*, 2017 CO 100, ¶ 26, 404 P.3d 273, 278 (concluding that the officer asking open-ended questions and the individual responding in narrative form weighed against a finding of custody).

### 4. Officer's Tone of Voice and General Demeanor

¶32 The officers maintained a light, conversational tone and a calm demeanor throughout the encounter. When the interrogation is in a "conversational tone," it is less likely to be custodial. *Davis*, ¶¶ 33–34, 449 P.3d at 741. Throughout the encounter, Officer Arvisais empathized with Willoughby about his relationship troubles, saying things like "I think we've all been there a little bit" and "it sounds like you have a pretty tough relationship."

### 5. Length and Mood of the Interrogation

¶33 The interrogation lasted for less than thirty minutes. A lengthy interrogation may indicate custody. *Compare Cline*, ¶ 31, 439 P.3d at 1239 (encounter lasting ninety minutes weighed in favor of custody), *with Begay*, ¶ 27, 325 P.3d at 1032 (encounter lasting less than twenty minutes weighed against custody). And for most of the interrogation, the officers were outside the apartment, speaking to Willoughby from the ground while he was on his second-story balcony; they were inside his apartment for less than ten minutes.

17

¶34 While the officers were armed, they neither drew their weapons nor made any show of force toward Willoughby. *See Cline*, ¶ 27, 439 P.3d at 1238 (holding that the defendant was not in custody, in part, because "[t]here was no show of force by anyone").

¶35 Additionally, Willoughby was visibly distraught throughout the encounter, oftentimes appearing to cry. *See Effland*, 240 P.3d at 875 (citing the defendant's emotional distress throughout the interrogation as a factor in favor of custody). In response, Officer Arvisais repeatedly calmed Willoughby by talking to him about his guitar and the types of music he plays, and by asking whether he wanted a glass of water or needed to "take a breath." At no point did the interrogation become confrontational. *People v. Klinck*, 259 P.3d 489, 494 (Colo. 2011) (concluding that officers asking nonconfrontational questions weighed against custody).

### 6. Limitation of Movement or Other Forms of Restraint

¶36 The officers did not impose any limitation on Willoughby's movement during the interrogation. The officers neither handcuffed Willoughby nor patted him down. When an officer imposes a limitation on a suspect's movement during the interrogation, that weighs in favor of custody. *See People v. Clark*, 2020 CO 36, ¶ 33, 500 P.3d 356, 362 (noting that this court has "relied on the absence of handcuffs or other restraints as suggesting that the suspect was not in custody"). Moreover, Willoughby moved and paced around the apartment, picking up

18

various objects and showing them to the officers. When Willoughby asked the officers if he could sit down, Officer Arvisais said, "Yeah man, you're free to have a seat." Indeed, the officers imposed so little limitation on Willoughby's movement that he smoked a cigar during the encounter, stating "I'm gonna smoke my cigar. I just—I need to smoke my cigar." While no factor is dispositive, this is significant. No one who had their freedom of movement restrained to the degree associated with a formal arrest would reasonably feel like they could smoke a cigar, let alone without asking for permission.

### 7. The Officer's Response to Willoughby's Questions

¶37    Officer Arvisais responded to Willoughby's questions about whether the officers would still arrest him if he let them inside in a way that suggested Willoughby's arrest wasn't inevitable. *See Mumford*, ¶ 13, 270 P.3d at 957 (listing the officer's response to questions asked by the defendant as a factor in determining custody (quoting *Matheny*, 46 P.3d at 465–66)). When Willoughby asked the officers whether letting them inside meant that he wouldn't go to jail, Officer Arvisais responded: "[I]f you're voluntar[ily] willing to let us go in there and look, and it proves your side of the story, then it will probably change you going to jail, but I'm not going to tell you one way or another." Officer Arvisais's response implied that if Willoughby could provide exculpatory evidence, the officers would likely not arrest him. Therefore, Officer Arvisais made it clear that

19

it was not a foregone conclusion that Willoughby would be arrested at the end of the encounter.

## 8.  Directions Given to Willoughby

¶38    The officers did not give Willoughby any directions.  When officers give the suspect directions, that weighs in favor of custody.  *See Garcia*, ¶ 28, 409 P.3d at 318.   Here, quite the opposite occurred, as the officers asked Willoughby for permission and direction throughout the encounter.  For example, during the interrogation, Officer Arvisais asked Willoughby for permission to look through a garbage bag on his balcony, and when Willoughby told him no, Officer Arvisais simply responded, "Okay."   Moreover, Officer Arvisais ensured that he had Willoughby's permission to "check around" and "turn some lights on," asked if Officer Wheeler could come inside, and sought Willoughby's consent to perform a protective sweep of the sofa.  Rather than directing Willoughby, the officers took direction from him, respecting his wishes when Willoughby withheld consent.

## 9.  Willoughby's Response to Directions

¶39    Because the officers did not give Willoughby directions, this factor is not applicable.

## 10.  Weighing the *Matheny* Factors

¶40    Considering the totality of the circumstances, there are factors in favor of custody: (1) the purpose of the encounter was to investigate an allegation of

domestic violence; (2) Willoughby was alone with the officers during the interrogation; (3) there were four officers at Willoughby's apartment, with two inside his apartment; (4) one officer stood at the door, blocking the only known exit; (5) Officer Arvisais told Willoughby that he was under arrest three times; and (6) Willoughby was visibly distraught throughout the encounter.

¶41 We conclude, however, that the factors against custody outweigh the factors in favor of custody. Specifically, (1) the officers arrived in the early evening, when it was still daylight; (2) the encounter took place in Willoughby's living room; (3) the officers asked open-ended questions, and Willoughby responded in narrative form; (4) the officers used a conversational, calm tone of voice and empathized with Willoughby; (5) the interrogation lasted less than thirty minutes; (6) the officers neither drew their weapons nor made a show of force; (7) the officers did not restrict Willoughby's movement and instead let him move freely around the apartment and—significantly—smoke his cigar; (8) Officer Arvisais told Willoughby that if he could "prove[] [his] side of the story," he would likely not go to jail; and (9) the officers did not give Willoughby directions.

¶42 Clearly, the *Matheny* factors are weighed differently depending on the circumstances. It's not as simple as counting factors. But courts should not rely on one factor or the absence of one factor to dictate the result of a case. Doing so would render that one factor determinative. Thus, when considering the totality

of the circumstances—as we must—the factors weighing against custody outweigh the factors in favor of custody.

¶43 To further support our conclusion, we turn to a relatively similar custody question in *Davis*, ¶ 24, 449 P.3d at 739, which we find instructive here. In that case, officers arrived at Davis's home at 6 a.m. *Id.* at ¶ 2, 449 P.3d at 735. Because Davis was still asleep, one of the officers entered his bedroom and shook him awake. *Id.* at ¶ 4, 449 P.3d at 735. The officer then instructed Davis to get up and asked him to move to another room. *Id.* at ¶ 5, 449 P.3d at 736. At one point, Davis asked the officers for permission to use the restroom, which the officers initially denied. *Id.* at ¶ 11, 449 P.3d at 737. The officers also initially prevented Davis from retrieving his glasses from his bedroom. *Id.* at ¶ 5, 449 P.3d at 736. The encounter lasted nearly ninety minutes. *Id.* at ¶¶ 2, 11, 449 P.3d at 735, 737.

¶44 This court recognized that four factors indicated that Davis may have been in custody: (1) the encounter lasted nearly ninety minutes; (2) one of the officers stood between Davis and the exit; (3) the officers physically "roused" Davis from bed and questioned him; and (4) the officers isolated Davis from other members of his family. *Id.* at ¶ 25, 449 P.3d at 739. We concluded, however, that Davis was not in custody primarily because of three factors: (1) the "neutral location" of the interrogation; (2) the "lack of force or physical restraint"; and (3) the "conversational tone of questioning." *Id.* at ¶ 26, 449 P.3d at 740.

¶45 *Davis* informs our conclusion that Willoughby was not in custody when he made the statements at issue here. Some factors that weighed in favor of custody in *Davis* are similar to Willoughby's interrogation (e.g., the officers stood by the door and isolated the suspect in each case). And a significant factor here that weighs in favor of Willoughby's custody was not present in *Davis* (namely, the officers telling Willoughby three times that he was under arrest). However, some factors that weighed in favor of custody in *Davis* are also inapplicable here (e.g., the officers roused Davis from bed at 6 a.m. and interrogated him for ninety minutes, but here, the officers didn't touch Willoughby and interrogated him for less than thirty minutes).

¶46 Most importantly, the three factors in *Davis* that we found persuasive as weighing *against* custody are also present here. First, Willoughby was interrogated in his living room—a neutral location. Second, the officers used neither force nor physical restraints on Willoughby; indeed, no officer touched Willoughby until his formal arrest, and he was free to move around and smoke a cigar. Finally, the officers used a conversational tone throughout the interrogation: Officer Arvisais talked to Willoughby about his hobbies and his relationship with K.M., and he tried to empathize with Willoughby when possible. Thus, like in *Davis*, the factors weighing against a finding of custody here outweigh the factors in favor of custody.

¶47 Therefore, considering the totality of the circumstances, Willoughby's freedom of movement wasn't restricted to the degree associated with a formal arrest. Thus, he was not in custody at the time of the interrogation.

### III. Conclusion

¶48 Accordingly, the trial court erred in suppressing Willoughby's statements under *Miranda*. We thus reverse that portion of the trial court's order and remand this case for further proceedings consistent with this opinion.

**JUSTICE BERKENKOTTER**, joined by **JUSTICE MÁRQUEZ** and **JUSTICE GABRIEL**, dissented.

JUSTICE BERKENKOTTER, joined by JUSTICE MÁRQUEZ and JUSTICE GABRIEL, dissenting.

¶49 The police told Willoughby at least four times that he was under arrest. One of the officers also explained that, because he had committed a domestic-violence offense, the officers had to arrest him and, further, that the officers could be liable if they did not take him to jail. When Willoughby point-blank asked if he was under arrest, the answer was "yes." And, notably, throughout the encounter, three police officers blocked the only known exit from his home, to ensure he did not leave.

¶50 The majority nonetheless concludes that Willoughby was not in custody when the officers interrogated him and thus the trial court erred when it suppressed the unwarned statements that Willoughby made to the police. Maj. op. ¶ 2. I disagree. Caselaw directs that when an officer tells a suspect that they are under arrest, courts are to give that statement great weight in determining whether a reasonable person would think that their freedom had been restricted to the degree associated with formal arrest. Applying that direction, I conclude that the words spoken by the officers to Willoughby, under these particular circumstances, would cause a reasonable person gauging their degree of freedom to conclude that the officers meant what they said: that they were under arrest.

1

And because I conclude that Willoughby was in custody at the time he was interrogated, I respectfully dissent.

¶51 I begin by reviewing the facts of the case based on the record before the trial court. Then, I explain why the majority's conclusion that Willoughby was not in custody for purposes of the Fifth Amendment misses the mark.

## I. Factual Background

¶52 On October 19, 2021, four police officers—Officer Wheeler, Officer Arvisais, Officer McNulty, and Officer Holladay—went to Willoughby's home to arrest him in connection with allegations that he had assaulted his girlfriend and damaged her property.[1] When the officers arrived, Officer Wheeler, the lead investigator, and Officer Arvisais went upstairs and knocked on the front door of Willoughby's second-floor apartment. From outside the door, they announced they wanted to talk with him, adding that he had committed a crime and that they wanted him to come downstairs.

---

[1] Section 18-6-803.6(1), C.R.S. (2022), prescribes, "When a peace officer determines that there is probable cause to believe that a crime or offense involving domestic violence . . . has been committed, the officer *shall*, without undue delay, arrest the person suspected of its commission." (Emphasis added.) *See Spalsbury v. Sisson*, 250 F.App'x 238, 246 (10th Cir. 2007) ("Colorado's domestic violence statute requires an officer to make an arrest when he has probable cause to believe that a crime involving domestic violence has occurred.").

¶53 Instead of answering the door, Willoughby went out to his balcony, which faced the apartment's parking lot, and started talking to Officer McNulty, who was standing on the sidewalk in front of the apartment. Because Willoughby would not come to the front door, Officer Wheeler descended to the sidewalk to direct the conversation. Officer Wheeler asked Willoughby about sending threatening text messages to his girlfriend, cutting up her driver's license, and destroying her framed artwork. Then Officer Wheeler informed Willoughby that destroying property is a crime—which, in his case, was a domestic-violence offense—and that he needed to come downstairs so she could arrest him. Elaborating, she told him that, because this was a domestic-violence offense, he had two choices: he could come downstairs or they could get a warrant for his arrest.

¶54 Willoughby was having none of it. He refused to leave his apartment and told Officer Wheeler that she needed to get a warrant. Willoughby was becoming increasingly upset and visibly agitated.

¶55 Officer Arvisais, who by then had joined Officer Wheeler on the sidewalk, also began talking with Willoughby. Officer Holladay replaced Officer Arvisais at Willoughby's front door, the only known exit from his home. Officer McNulty stood at the bottom of the stairs leading from Willoughby's apartment to the sidewalk and parking lot. Officer Arvisais and Officer Wheeler then discussed the fact that they had to arrest Willoughby since he was accused of a crime of domestic

3

violence, which meant they couldn't just leave the scene. So, they decided that Officer Wheeler would return to the station to get an arrest warrant and a warrant to search Willoughby's home while the other officers remained on scene.

¶56 While Officers Wheeler and Arvisais conferred about the best strategy for taking Willoughby into physical custody—either coaxing him to a public space or getting an arrest warrant—Willoughby called his mother. Willoughby told her that there were four officers at his door, and they were getting a warrant for his arrest. He told his mother they were going to arrest him three times during their conversation, which lasted about a minute.

¶57 After Officer Wheeler left, Officer Arvisais continued to talk with Willoughby from the sidewalk below his balcony. Willoughby continually interrupted Officer Arvisais, trying to persuade Officer Arvisais not to arrest him. During their exchange, Officer Arvisais repeatedly told an increasingly agitated Willoughby that (1) he was "under arrest for domestic violence and criminal mischief," (2) the police had "probable cause to arrest him," and (3) he was "going to jail." The dialog between Officer Arvisais and Willoughby included the following exchange:

> Arvisais: We have probable cause; we have text messages and photos. At this time, you are under arrest for criminal mischief and domestic violence.
>
> Willoughby: Why do I have to go to jail?

| Arvisais: | Because we can't walk away from this. . . . |
|---|---|
| Arvisais: | [At] this time you are under arrest, and we are going to apply for the warrant. |
| Willoughby: | Am I under arrest? |
| Arvisais: | You are. |
| Willoughby: | For what? |
| Arvisais: | For criminal mischief and domestic violence. . . . |
| Arvisais: | We have probable cause for domestic violence and criminal mischief. . . . |
| Arvisais: | We are going to take you to jail. You are under arrest. . . . |

¶58 Then, Officer Arvisais explained to Willoughby *why* he had to go to jail: "if we walk away, we can be held liable if something else happens." Officer Arvisais reminded him that it would be getting dark and that he did not want to have to put bright lights on Willoughby's apartment, thus embarrassing Willoughby in front of his neighbors.

¶59 A frantic Willoughby then told Officer Arvisais that he had exculpatory evidence in his apartment, and that Officer Arvisais could enter his apartment to see that evidence. Willoughby insisted, however, that no other officers enter his home.

¶60 As he walked up to Willoughby's apartment, Officer Arvisais again informed Willoughby that even with this evidence he was "not going to lie to you you're not going to jail." He also told Willoughby that another officer, Officer

5

Holladay, would have to remain at the open front door for officer safety. Although Willoughby did not consent to Officer Holladay entering his home, Officer Holladay nonetheless entered the home and stood fully inside the doorway just inside the apartment, with his foot holding the door open.

¶61 After Officer Arvisais entered the apartment, he and Willoughby discussed Willoughby's art. Willoughby explained that he would not destroy his own paintings and easel. They also conversed about playing the guitar. Willoughby asked if he could sit on the couch. Officer Arvisais responded that Willoughby could sit where he wanted, but before he allowed Willoughby to sit down, Officer Arvisais searched the general area to ensure that there was "nothing in the cushions."

¶62 While Officer Arvisais was in the apartment, Officer McNulty successfully contacted Officer Wheeler and asked her to return to the scene because Willoughby had "allowed them inside the apartment." Upon her return, Officer Wheeler entered Willoughby's apartment—with two other officers present—and, without *Mirandizing* him, interrogated Willoughby. This fact is undisputed.

¶63 During her questioning, Willoughby became even more distraught; he cried and smoked with the officers' permission. Willoughby told Officer Wheeler that he was worried that he was going to go to jail, but he nonetheless answered her questions and incriminated himself. Then Officer Arvisais placed Willoughby in

"a single wing hold" and Officer Wheeler "tight[ened]" handcuffs around his wrists thus *formally* arresting him.

## II. Standard of Review

¶64 "A trial court's determination of whether a suspect was in custody is a mixed question of law and fact." *People v. Elmarr*, 181 P.3d 1157, 1161 (Colo. 2008). In reviewing the facts, we may look beyond the facts in the trial court's order and consider the undisputed facts in the record. *People v. Pleshakov*, 2013 CO 18, ¶ 16, 298 P.3d 228, 232. Additionally, we review de novo the ultimate legal question of whether those facts, under the totality of the circumstances, establish that the suspect was in custody when interrogated. *Id.*; *see also People v. Pittman*, 2012 CO 55, ¶ 6, 284 P.3d 59, 61.

## III. Analysis

¶65 In my view, the majority is mistaken when it employs our custody framework in *People v. Matheny*, 46 P.3d 453 (Colo. 2002), to conclude that Willoughby was not in custody and that his statements, accordingly, are admissible.

¶66 I first deconstruct how the majority analytically takes a wrong turn.

7

## A. The Majority's Fifth Amendment Custody Analysis is Flawed

### 1. Legal Framework

¶67 The Fifth Amendment protects a suspect's right against self-incrimination. *See* U.S. Const. amends. V, XIV; Colo. Const. art. II, § 18. For the purpose of *Miranda*, a suspect is in custody when a reasonable person in the suspect's position would believe that their freedom had been restricted to the degree associated with formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). Whether, in a particular circumstance, the deprivation of a suspect's freedom is associated with formal arrest is fact-specific and governed by the totality of the circumstances. *See Matheny*, 46 P.3d at 468.

¶68 As the majority notes, we articulated an inexhaustive list of factors in *Matheny* for courts to consider in making this assessment:

(1) the time, place, and purpose of the encounter;

(2) the persons present during the interrogation;

(3) the words spoken by the officer to the defendant;

(4) the officer's tone of voice and general demeanor;

(5) the length and mood of the interrogation;

(6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation;

(7) the officer's response to any questions asked by the defendant;

(8) whether directions were given to the defendant during the interrogation; and

8

(9) the defendant's verbal or nonverbal response to such directions.

*Id.* at 465–66.

¶69 Importantly, as we have emphasized in our precedent and the majority acknowledges, no single factor is determinative, and this analysis is highly fact-specific. *Pleshakov*, ¶ 20, 298 P.3d at 233.

## 2. Application

¶70 In my view, the majority fails to give (1) substantial weight to Officer Arvisais explicitly telling Willoughby he was under arrest four times and (2) any weight to Officer Arvisais's numerous additional statements explaining to Willoughby that he had to go to jail. Instead, it gives far too much weight to less pertinent factors and weighs all the *Matheny* factors equally, leading to the wrong conclusion that Willoughby was not under arrest.

### a. Officer Arvisais Repeatedly Told Willoughby He Was Under Arrest

¶71 While an officer's uncommunicated subjective intent has no bearing on whether a suspect is in custody when they are interrogated, the Supreme Court instructs that "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." *Stansbury v. California*, 511 U.S. 318, 325 (1994). And when an officer tells a suspect that they are under arrest, courts give that statement great weight in determining whether a reasonable person would think that their freedom had been restricted

9

to the degree associated with formal arrest. *People v. Thomas*, 839 P.2d 1174, 1178 (Colo. 1992) (explaining that when an officer told a suspect that "he was being detained and, at the very least, would receive a ticket," a reasonable person in the suspect's position would understand that their freedom was curtailed to the degree of a formal arrest).

¶72    Here, Officer Arvisais explicitly told Willoughby that he was under arrest—four times—and that he *had to* go to jail.[2]  And while the majority acknowledges that courts place "great weight" on whether police tell a suspect that they are under arrest, maj. op. ¶ 28, it quickly pivots to emphasize that "[t]his one factor, however, is not dispositive." *Id.* at ¶ 29.  To be sure, this is a correct, generalized statement of the law.  It is difficult to discern here, though, why the majority goes on to treat this factor as if it has no greater weight than any of the other factors in play.  That is, the majority does not give Officer Arvisais's repeatedly telling Willoughby that he was under arrest the substantial weight caselaw indicates those words are due.  Instead, it gives it equal weight to every other factor.

---

[2] The majority indicates that Officer Arvisais told Willoughby he was under arrest three times.  Maj. op. ¶ 14.  This does not include Officer Arvisais saying "yes" when Willoughby directly asked if he was under arrest.  To my mind, this is yet another way that Officer Arvisais told Willoughby he was under arrest.  *See supra* at ¶ 57.

¶73 This error is then compounded by the majority's failure to address Officer Arvisais's additional statements to Willoughby regarding his arrest. For instance, Officer Arvisais explained to Willoughby *why* the police wanted him to come downstairs and *why* he had to be arrested: that is, he committed a crime of domestic violence, a mandatory-arrest crime. The majority doesn't even mention that statement, let alone consider the impact it would have on a reasonable person gauging their breadth of freedom, alone or in tandem with the officer's other statements. Officer Arvisais also explained to Willoughby that the police could not let him go because the officers faced liability if they did not arrest him and something else happened. The majority again does not even mention that statement or the effect it would have on a reasonable listener, particularly in conjunction with the officer telling Willoughby—repeatedly—that he was under arrest.

¶74 To my way of thinking, a reasonable person who heard Officer Arvisais's statements would have no question that their freedom had been restricted to the degree associated with formal arrest. Viewed from this vantage point, circumstances like being allowed to smoke, or other subtle, nonverbal, or contextual clues would do little—very little indeed—to tip the *Matheny* scales. Which is all to say that the majority also unreasonably weighs the factors against custody too heavily.

11

## b. The Other *Matheny* Factors Do Not Outweigh Officer Arvisais Repeatedly, Explicitly Telling Willoughby that He Was Under Arrest

### i. Time, Place, and Purpose

¶75 First, while the majority posits that the officers came to Willoughby's home "to investigate an allegation of domestic violence," maj. op. ¶ 25, it neglects to mention that the officers had an additional purpose: to arrest him. This is because—as Officer Arvisais explained in lay terms to Willoughby—"[w]hen a peace officer determines that there is probable cause to believe that a crime or offense involving domestic violence . . . has been committed, the officer *shall*, without undue delay, arrest the person suspected of its commission." § 18-6-803.6(1), C.R.S. (2022) (emphasis added).

¶76 As noted, Officer Arvisais not only told Willoughby numerous times that the officers were there to arrest him and that they had probable cause to do so, he also specifically told Officer Wheeler that they could not leave the scene since they had probable cause for a domestic-violence offense.

¶77 Thus, in my view, while the officers may have gone to Willoughby's home to investigate, there is no question that the purpose of the encounter was also to arrest him. This also favors the conclusion that Willoughby was in custody. *See Matheny*, 46 P.3d at 465. As previously noted, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the

12

individual being questioned. Those beliefs are relevant . . . to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Stansbury*, 511 U.S. at 325 (citations omitted) (quoting *Berkemer*, 468 U.S. at 440); *accord People v. Hughes*, 252 P.3d 1118, 1122 (Colo. 2011); *see also Matheny*, 46 P.3d at 467 (holding that the suspect was not in custody because officers told him he was not under arrest).

¶78 True, the officers may have said this at first from a distance, but Officer Arvisais again told Willoughby, as Officer Arvisais entered Willoughby's apartment, that he could not tell him that he was not going to jail. And when Officer Wheeler went to the station to get an arrest warrant because Willoughby refused to come out of his apartment without one, not one, not two, but three officers remained at Willoughby's apartment blocking his egress to ensure that he could not leave. In my view, the officers made it abundantly clear through both their words and their actions that their purpose in being there was to take Willoughby into custody and charge him with a domestic-violence offense based on his girlfriend's complaint.

¶79 Because the officers' statements and actions repeatedly communicated to Willoughby that he was under arrest, I have no doubt that a reasonable person in those circumstances would have understood that their freedom was curtailed to

13

the degree associated with formal arrest when Officer Wheeler began her interrogation.

### ii. Persons Present During the Interrogation

¶80 I agree with the majority that this factor weighs in favor of custody. The number of officers focused on Willoughby and the isolated location of the interrogation favors the conclusion that he was in custody. Maj. op. ¶ 27. We have generally held that when a suspect is questioned in public or has access to friends or family and the majority of officers present are not simultaneously focused on the suspect, then the suspect is not in custody for purposes of *Miranda*. *See People v. Garcia*, 2017 CO 106, ¶ 31, 409 P.3d 312, 318–19; *Pleshakov*, ¶ 30, 298 P.3d at 235. Here, Willoughby was alone in his apartment when Officer Wheeler interrogated him. And three of the four officers at the scene were focused on him as he made the incriminating statements. These facts favor custody.

### iii. The Officer's Tone of Voice and General Demeanor, Length and Mood of the Interrogation, and Limitation of Movement or Other Form of Restraint

¶81 The majority accurately describes the officers' tone of voice and general demeanor as well as the length of the interrogation—factors which do not favor custody. Maj. op. ¶¶ 32–33. They also consider that Willoughby was "visibly distraught throughout the encounter, oftentimes appearing to cry," and appear to acknowledge that a suspect's emotional state favors custody. *Id.* at ¶ 35. But the

14

majority doesn't appear to give Willoughby's emotional state any real weight, instead focusing on Officer Arvisais's efforts to de-escalate him and viewing that as a factor that disfavors custody. *Id.* I acknowledge that an officer's demeanor is a relevant factor, but the majority's approach again appears to distort the weight of the opposing factors. It places too much weight on Officer Arvisais's measured tone and too little on Willoughby's emotional distress. *Effland v. People*, 240 P.3d 868, 875 (Colo. 2010) (emotional distress during an interrogation favors that the suspect is in custody). Willoughby was crying and visibly upset when Officer Wheeler questioned him, weighing in favor of custody.

¶82 But more significantly, under the unique circumstances of this case, I don't see how you can uncouple these factors from what Willoughby had been told about being under arrest, about having to go to jail, and the positioning of the officers. A reasonable person under these circumstances would, in my view, be hard pressed in the face of Officer Arvisais's words to conclude—simply because they were allowed to sit on a sofa or smoke—that they could simply get up and leave or that their formal arrest was not imminent. Would a reasonable person whose only way out of their home was blocked by an uninvited officer *after* repeatedly being told that they were under arrest and had to go to jail—really believe that they were *not* deprived of their freedom to the degree associated with formal arrest? The answer, I suggest, is no.

15

#### iv. The Officer's Response to Willoughby's Questions

¶83    The majority interprets Officer Arvisais's response to Willoughby's questions about whether the officers would still arrest him if he let them inside (and thus close enough to place him in handcuffs) as suggesting that Willoughby's arrest was not inevitable.  Maj. op. ¶ 37.  What the majority omits is that as he walked up to Willoughby's apartment, Officer Arvisais again informed Willoughby that even with this evidence he was "not going to lie to you that you're not going to jail."

¶84    Thus, I disagree that Officer Arvisais suggested to Willoughby that his arrest was not inevitable, and I view this factor as also favoring custody.

#### v. Directions Given to Willoughby

¶85    The majority acknowledges that when officers give a suspect directions, that weighs in favor of custody.  Maj. op. ¶ 38.  Then it states that the officers did not give Willoughby any directions.  *Id.*  But that is not so.

¶86    After informing Willoughby that destroying property is a crime—which, in his case, was a domestic-violence offense—Officer Wheeler told Willoughby that he needed to come downstairs so she could arrest him.  Not long thereafter, the officers told Willoughby he was under arrest (repeatedly), Officer Arvisais explained the reasons Willoughby had to go to jail, and he described the officers' exposure to liability if they did not formally arrest him.

16

¶87 To be sure, Officers Wheeler and Arvisais were standing below Willoughby's balcony when Officer Wheeler initially directed Willoughby to come downstairs so she could arrest him. But between the officers' actual words—including Officer Arvisais's re-emphasizing that Willoughby was going to jail as he entered his home—and the officers blocking Willoughby's egress from his apartment, the message was clear: you are under arrest, and we are just waiting until we can get close enough to handcuff you to take you to jail. The officers' directions to Willoughby favor custody.

### vi. Willoughby's Response to Directions

¶88 The majority concludes this factor was inapplicable because the officers did not give Willoughby any directions. Maj. op. ¶ 39. Again, I disagree for the reasons explained above. I also conclude that Willoughby's reaction to the officers' directions weighs heavily in favor of custody. Willoughby was agitated, escalated, and often sobbing throughout most of the thirty-minute encounter. He did not want to be taken to jail and made this point to the officers repeatedly, as he tried frantically to persuade Officer Arvisais not to take him to jail. Eventually, Willoughby bargained with the only chip Officer Arvisais seemed interested in: letting the officer come into his home to get close enough to formally arrest him.

17

### c. Weighing the *Matheny* Factors

¶89 While I agree that no one *Matheny* factor is dispositive, the majority's conclusion seemingly rests on the mistaken belief that *Matheny* requires a simple mathematical tally of the number of factors for custody and the number of factors against to determine if a *Miranda* advisement is required before interrogation. But that cannot be. It is axiomatic that under different circumstances the factors necessarily bear different weights. Here, the majority straight-up tallies the factors, concluding that the factors against custody win—9 to 6. Maj. op. ¶¶ 40–41.

¶90 And even if I agreed with the majority's classification of factors as for or against custody, I would still disagree with its calculus because the numerous times that the officers told or otherwise indicated to Willoughby that he was under arrest must be afforded substantial weight. This makes sense because these words matter. And here, the specific words spoken by these officers, particularly under these specific circumstances, would cause a reasonable person gauging the breadth of their freedom of action to conclude that they were in custody.[3]

¶91 Moreover, as I explained above, I don't agree with the majority's analysis or weighting of the custody factors. In my view, the majority neglects to properly

---

[3] Of course, if the police had not repeatedly told Willoughby that he was under arrest, my assessment of the *Matheny* factors would be far different, and this case would have a completely different outcome.

consider some factors and similarly fails to give others the appropriate weight that precedent demands. Here, the factors for custody far outweigh the factors against custody. The fact that Willoughby was allowed to smoke and the fact that the officers spoke to him in a conversational tone necessarily carry far less weight in the totality of the circumstances analysis than does the fact that the officers repeatedly told Willoughby he was under arrest.

¶92 I also take issue with the majority's reliance on *People v. Davis*, 2019 CO 84, 449 P.3d 732, to support its conclusion that Willoughby was not in custody. Maj. op. ¶¶ 43–46. There, two officers went to Davis's house at 6 a.m. in response to a reported sexual assault. *Davi*s, ¶ 2, 449 P.3d at 735. When they arrived, Davis's stepmother escorted the officers to Davis's basement bedroom. *Id.* at ¶ 3, 449 P.3d at 735. The officers woke Davis up and took him down a hall to talk. *Id.* at ¶¶ 4–6, 449 P.3d at 735–36. During the ninety-minute encounter, the police did not draw their weapons and did not significantly restrict Davis's movement; in fact, they accompanied him to look for things in his bedroom twice, and spoke to Davis in a conversational tone. *Id.* at ¶¶ 8, 26, 32, 449 P.3d at 736, 740–41. The men also chatted about the Broncos. *Id.* at ¶ 8, 449 P.3d at 736. During the conversation, Davis eventually confessed to sexual contact with the victim but claimed it was consensual. *Id.* at ¶ 7, 449 P.3d at 736. After that, one of the officers told Davis that they did *not* have probable cause to arrest him, and if they did, they would

"obviously" let him know. *Id.* at ¶ 9, 449 P.3d at 736. The officers then continued to question to Davis for a total twenty-six minutes before placing him under arrest. *Id.* at ¶¶ 9, 11, 449 P.3d at 736.

¶93 Before trial, Davis moved to suppress his statements. *Id.* at ¶ 12, 449 P.3d at 737. The trial court granted his motion, but we reversed, concluding that under the totality of the circumstances, Davis was not in custody at the time he made his unwarned statements. *Id.* at ¶¶ 14, 37, 449 P.3d at 737, 742. We reasoned that, despite the prolonged encounter, the totality of the circumstances weighed against custody because (1) the interrogation took place in a neutral location, (2) Davis was not physically restrained, and (3) the tone of the questioning was conversational. *Id.* at ¶¶ 30–31, 33, 449 P.3d at 740–41.

¶94 While the majority indicates that the facts here are similar — or at least similar enough — to those in *Davis* to warrant the same conclusion, I am not persuaded. Most importantly and most obviously, the police in *Davis* never told the suspect they had probable cause to arrest him or that he was under arrest or that he had to go to jail or that they, the officers, would face personal liability if they did not formally arrest him. To the contrary, they explicitly told Davis that they did not have probable cause to arrest him. *Id.* at ¶ 9, 449 P.3d at 736.

20

# IV. Conclusion

¶95   Because Willoughby was in custody when Officer Wheeler interrogated him, his un-*Mirandized* statements should be suppressed.   For the reasons explained above, I respectfully dissent.