1
 2024 CO 58 Rachel Ann Niemeyer, Petitioner: v. The People of the State of Colorado, Respondent: No. 23SC117
Supreme Court of Colorado, En Banc
September 9, 2024
 
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 18CA1877
 
 
          
 Attorneys for Petitioner:
 
 
           Megan
 A. Ring, Public Defender
 
 
           Karen
 Mahlman Gerash, Deputy Public Defender
 
 
          
 Denver, Colorado
 
 
          
 Attorneys for Respondent:
 
 
           Philip
 J. Weiser, Attorney General
 
 
           Grant
 R. Fevurly, Senior Assistant Attorney General
 
 
          
 Denver, Colorado
 
 
          
 Attorneys for Amici Curiae American Civil Liberties Union of
 Colorado and National Association of Criminal Defense
 Lawyers:
 
 
          
 Haddon, Morgan and Foreman, P.C.
 
 
           Laura
 A. Menninger
 
 
           Jacob
 McMahon
 
 2
 
           Norman
 R. Mueller
 
 
          
 Denver, Colorado
 
 
          
 Timothy R. Macdonald
 
 
           Emma
 Mclean-Riggs
 
 
           Sara
 Neel
 
 
          
 Denver, Colorado
 
 
          
 JUSTICE BOATRIGHT delivered the Opinion of the Court, in
 which CHIEF JUSTICE MARQUEZ, JUSTICE HOOD, JUSTICE GABRIEL,
 JUSTICE HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER
 joined.
 
 
          
 OPINION
 
 
          
 BOATRIGHT JUSTICE
 
 3
 
          ¶1
 Police questioned Rachel Ann Niemeyer in an interrogation
 room at the police station after her husband suffered a
 gunshot wound to the head. Niemeyer made incriminating
 statements during the interrogation. After the People charged
 her with murdering her husband, Niemeyer moved to suppress
 these statements, arguing that they were obtained in
 violation of Miranda v. Arizona, 384 U.S. 436
 (1966). The trial court denied her motion to suppress,
 determining that she was not in custody when she made the
 statements. A jury convicted Niemeyer of second-degree murder
 and other offenses. After the court of appeals affirmed, we
 granted certiorari to determine whether Niemeyer was in
 custody when she was questioned by police.[1]
 
 
          ¶2
 We hold that Niemeyer was in custody for Miranda
 purposes when she was interrogated at the police station.
 Therefore, we reverse the judgment of the court of appeals
 and remand for further proceedings consistent with this
 opinion.
 
 
          I.
 Facts and Procedural History
 
 
          ¶3
 On October 4, 2017, Craig police officers arrived at a motel
 room in response to a 911 call regarding a male with a
 gunshot wound to the head. Officers found
 
 4
 
 Niemeyer crouched in front of her husband, M.F., holding his
 head. M.F. had suffered a gunshot wound to his right ear and
 died from his injuries the next day.
 
 
          ¶4
 Initially, the officers investigated the incident as an
 attempted suicide. Officer Roland arrived on the scene and
 supervised Niemeyer while paramedics treated M.F. and
 officers processed the scene.[2] Visibly intoxicated and
 distraught, Niemeyer told Officer Roland that she and M.F.
 had been drinking for several hours. Niemeyer explained that
 just prior to the incident, she and M.F. were arguing when
 M.F. picked up his .22 caliber rifle.[3] Niemeyer told Officer Roland
 she thought the rifle was unloaded. She said that M.F. asked
 her to shoot him, and when she refused, M.F. shot himself.
 Over the next half hour, Niemeyer told Officer Roland that
 M.F. had frequently threatened suicide, that they were
 experiencing financial and relationship issues, and that M.F.
 struggled with alcohol abuse.
 
 
          ¶5
 The paramedics transported M.F. to the hospital. Niemeyer
 asked Officer Roland several times if he could take her to
 see M.F. because she was too intoxicated to drive. Officer
 Roland demurred, telling her they would "work on that as
 soon as we can." While still at the motel, Officer
 Roland continued to ask Niemeyer clarifying questions about
 what happened in the motel room. Another
 
 5
 
 officer approached and asked Niemeyer if she would go to the
 police station[4] with Officer Roland while they finished
 processing the scene. A few minutes later, Niemeyer and
 Officer Roland walked to his squad car, and he directed her
 to ride in the backseat behind the cage, though he didn't
 handcuff her. During the drive to the police station,
 Niemeyer repeatedly asked if she could go to the hospital to
 see M.F., and each time Officer Roland responded, "We
 gotta go down to the [police station] first, okay?"
 
 
          ¶6
 After arriving at the station, Officer Roland led Niemeyer to
 an interrogation room, where they were joined by a victim
 advocate. Shortly after, Officer Roland placed plastic bags
 on Niemeyer's hands, securing them with zip ties to
 preserve any potential gunshot residue. Officer Roland told
 Niemeyer that this was a routine procedure, but he did not
 seek her consent or explain why he was putting the plastic
 bags on her hands. Niemeyer tried to take the plastic bags
 off several times, but Officer Roland and the victim advocate
 stopped her and told her that she needed to leave them on
 (e.g., "Nope." or "You gotta leave them on,
 Rachel.").
 
 
          ¶7
 During her conversation with the victim advocate, Niemeyer
 appeared relaxed and conversational, even laughing a few
 times. Intermittently, however, she would say that she wanted
 to go to the hospital and ask when the officers
 
 6
 
 could take her there. At one point, Niemeyer expressed
 frustration at not being able to go see M.F., saying that she
 wanted to leave the station and go to the hospital on her
 own. Officer Roland and the victim advocate both deflected
 her requests-"We've got to do this
 first."-explaining that they had more procedures to
 follow at the station but could help her get to the hospital
 at some point.
 
 
          ¶8
 At the end of her conversation with the victim advocate,
 Niemeyer interjected, "God d***. Did I f****** shoot
 him?" The victim advocate told her that was what the
 hand-bagging test would explain.
 
 
          ¶9
 Just before midnight, and approximately an hour after police
 brought Niemeyer to the station, Detective Rimmer joined her
 in the interrogation room and dismissed the victim advocate.
 He removed the bags, swabbed Niemeyer's hands for gunshot
 residue, and told her that she was not under arrest and did
 not need to talk to him. Niemeyer asked again if she could go
 to the hospital. Detective Rimmer replied, "There's
 a couple things I gotta do here first, and then I'll work
 on trying to get you up there." Niemeyer asked to go to
 the restroom, and police personnel escorted her there and
 back.
 
 
          ¶10
 When Detective Rimmer walked back into the interrogation
 room, Niemeyer asked, without any prompting, "So what we
 got going on, did I shoot him?" Detective Rimmer
 responded, "I don't know, that's what I'm
 here to talk to you about." For the next twenty-three
 minutes, Detective Rimmer asked
 
 7
 
 Niemeyer questions about the incident in the motel room.
 Niemeyer attempted to explain what happened, at times
 appearing confused and unsure of the sequence of events.
 About halfway through the conversation, Niemeyer stated that
 she and M.F. were both intoxicated and were "playing
 around" with the rifle, passing it back and forth to
 each other. Niemeyer stated that M.F. had assured her there
 were no bullets in the rifle but that the "next thing
 [she knew] there was blood everywhere."
 
 
          ¶11
 Niemeyer continued to ask Detective Rimmer if she had shot
 her husband and if he knew what happened. Detective Rimmer
 either didn't address her question or replied with a
 version of, "I don't know." And over the course
 of the interview, Niemeyer uttered several variations of the
 following: "I think I shot him.... How else would it
 have happened? . . . Did he shoot himself? . . . It was only
 us two in the room.... Did I shoot him? I think I shot
 him." In between these statements, she said that she
 did not shoot M.F. and wasn't sure what had
 happened. She also asked again if she could go to the
 hospital, to which Detective Rimmer replied, "Let's
 finish up here; let's get what we need to do here done,
 okay."
 
 
          ¶12
 Detective Rimmer continued to ask detailed questions about
 what happened and what Niemeyer remembered. At one point,
 Niemeyer stated, "Oh my God, I shot him." Shortly
 after, Detective Rimmer left the interrogation room.
 
 8
 
 When he returned three minutes later, he read Niemeyer her
 Miranda rights. She immediately invoked her right to
 counsel, and Detective Rimmer and Officer Roland arrested
 her.
 
 
          ¶13
 The People charged Niemeyer with first-degree murder, among
 other offenses. Before trial, she moved to suppress the
 statements she made to Detective Rimmer, asserting that they
 were involuntary and the product of an unwarned custodial
 interrogation. The trial court denied the motion.
 
 
          ¶14
 At trial, Niemeyer testified that she asked Detective Rimmer
 if she had shot M.F. because she was under the impression
 that the hand-bagging test would explain what had happened to
 her husband. She also asserted that at the time of the
 interrogation, she was in shock and that her statements to
 Detective Rimmer were unreliable based on the context of the
 incident. She stated that she did not shoot M.F., but that
 she also did not remember if she had ever held the rifle or
 pulled the trigger. A jury found Niemeyer guilty of
 second-degree murder, second-degree assault, and two counts
 of prohibited use of a weapon.
 
 
          ¶15
 Niemeyer appealed, arguing that the trial court erred in
 denying her motion to suppress. A split division of the court
 of appeals affirmed. People v. Niemeyer, No.
 18CA1877, ¶ 1 (Oct. 27, 2022). The majority held that
 while a reasonable person in Niemeyer's position would
 not have considered herself free to leave, her freedom of
 action was not curtailed to the degree associated with a
 formal arrest.
 
 9
 
 Id. at ¶¶ 28-29. The majority concluded
 that, based on the officers' actions and statements
 leading up to her arrest, a reasonable person in her position
 would believe that they would be on their way to the hospital
 "as soon as the hand-bagging procedure was
 completed." Id. at ¶ 29. The majority also
 found that the hand-bagging procedure did not "convert
 an otherwise noncustodial situation into a custodial
 one." Id. at ¶ 30. The majority reasoned
 that even though bagging someone's hands could suggest
 that police believed they were involved in a crime, it does
 not, on its own, "convey the message that the person is
 under arrest." Id.
 
 
          ¶16
 Judge Richman dissented, contending that the police's
 actions and statements to Niemeyer demonstrated that they
 would "not even consider taking her to the hospital
 until after they completed any number of unspecified,
 potentially time-consuming tasks." Id. at
 ¶ 52 (Richman, J., dissenting). Judge Richman also
 disagreed with the majority's conclusion regarding the
 hand-bagging procedure: "[W]e have in this case a
 situation where the person was forced to keep the bags on her
 hands against her will and for about an hour."
 Id. at ¶ 54. Accordingly, Judge Richman
 asserted that the hand-bagging, the "runaround" by
 police, and the fact that Niemeyer was alone with Detective
 Rimmer in an interview room with the door shut all led to the
 conclusion that Niemeyer was in custody at the time of the
 interrogation. Id. at ¶ 55.
 
 10
 
          ¶17
 Niemeyer sought certiorari review from this court, which we
 granted.
 
 
          II.
 Analysis
 
 
          ¶18
 We start with the standard of review. Then we discuss what
 constitutes a custodial interrogation. We next determine that
 a reasonable person in Niemeyer's position during the
 interrogation with Detective Rimmer would have believed they
 were deprived of their freedom of action to a degree
 associated with a formal arrest. Thus, Niemeyer's
 statements to Detective Rimmer were the product of an
 unwarned custodial interrogation and should have been
 suppressed. Last, we determine that the trial court's
 error was not harmless.
 
 
          A.
 Standard of Review
 
 
          ¶19
 A trial court's custody determination for
 Miranda purposes presents a mixed question of law
 and fact. People v. Bohler, 2024 CO 18, ¶ 17,
 545 P.3d 509, 514. We defer to a trial court's findings
 of fact if they are supported by competent evidence and rely
 on undisputed facts in the record, but we apply the law de
 novo. Id. However, we may also independently review
 recorded statements, including interrogations. Id.
 
 
          ¶20
 We review trial errors of constitutional dimension under the
 constitutional harmless error standard. Hagos v.
 People, 2012 CO 63, ¶ 11, 288 P.3d 116, 119. Under
 this standard, we must reverse unless the error was
 "harmless beyond a reasonable doubt." Id.
 (quoting Chapman v. California, 386 U.S. 18, 24
 (1967)). More
 
 11
 
 specifically, if there is the reasonable possibility that the
 error might have contributed to a conviction, we reverse.
 Id.
 
 
          B.
 Custody Determinations Under Miranda
 
 
          ¶21
 To protect an individual's Fifth Amendment right against
 self-incrimination, police must provide individuals with
 certain warnings prior to a custodial interrogation.
 Miranda, 384 U.S. at 444. Miranda prohibits
 the prosecution from introducing statements in its
 case-in-chief procured by custodial interrogation
 unless the police administer these warnings before
 the interrogation. Id. However, these protections
 only apply if an individual is in custody at the time of the
 interrogation. Effland v. People, 240 P.3d 868, 873
 (Colo. 2010). Here, the parties agree that the police
 interrogated Niemeyer at the police station. Therefore, our
 inquiry centers solely on whether she was in custody during
 the interrogation.
 
 
          ¶22
 A person is in custody if a reasonable person in the same
 position would think their freedom of action was curtailed to
 a degree associated with a formal arrest. People v.
 Cline, 2019 CO 33, ¶ 17, 439 P.3d 1232,1237. Courts
 evaluate the totality of the circumstances to determine
 whether an individual was in custody. People v.
 Willoughby, 2023 CO 10, ¶ 21, 524 P.3d 1186, 1191.
 This assessment considers the objective circumstances of the
 interrogation rather than the subjective beliefs of the
 officers or the defendant. People v. Davis, 2019 CO
 84, ¶ 19, 449 P.3d 732, 738.
 
 12
 
 In making this determination, courts may consider the
 following non-exhaustive factors:
 
 
 (1) the time, place, and purpose of the encounter;
 
 
 (2) the persons present during the interrogation;
 
 
 (3) the words spoken by the officer to the defendant;
 
 
 (4) the officer's tone of voice and general demeanor;
 
 
 (5) the length and mood of the interrogation;
 
 
 (6) whether any limitation of movement or other form of
 restraint was placed on the defendant during the
 interrogation;
 
 
 (7) the officer's response to any questions asked by the
 defendant;
 
 
 (8) whether directions were given to the defendant during the
 interrogation; and
 
 
 (9) the defendant's verbal or nonverbal response to such
 directions.
 
 
 People v. Matheny, 46 P.3d 453, 465-66 (Colo. 2002).
 No single factor is determinative, and courts may consider
 any number of them when making a custody evaluation.
 Willoughby, ¶ 21, 524 P.3d at 1192. With this
 framework in mind, we turn to the case at hand.
 
 
          C.
 Application of the Matheny
 Factors
 
 
          ¶23
 We now consider whether Niemeyer was in custody for
 Miranda purposes during the interrogation. We first
 discuss the Matheny factors that weigh against a
 finding of custody before turning to those that weigh in
 favor of custody. Upon review of the totality of the
 circumstances, we conclude that Niemeyer was in custody
 during the interrogation with Detective Rimmer.
 
 13
 
          ¶24
 As a threshold matter, because Niemeyer was under police
 supervision from the moment officers arrived on the scene
 until her arrest at the station, we will evaluate the
 entirety of her encounter with the police.
 
 
          1.
 Factors Weighing Against Custody
 
 
          ¶25
 We first consider the circumstances that weigh against a
 finding of custody: the words spoken by the officers to the
 defendant; the officers' tone of voice and general
 demeanor; and the length and mood of the interrogation. We
 discuss each of these factors in turn.
 
 
          a.
 Words Spoken by the Officers to Niemeyer
 
 
          ¶26
 Open-ended questions posed by officers and long-form
 narrative responses by defendants weigh against custody.
 See, e.g., Willoughby, ¶ 31, 524 P.3d
 at 1193. Here, when Officer Roland arrived on the scene, he
 asked Niemeyer open-ended questions about what had
 transpired. Niemeyer responded in narrative form, often
 volunteering significant detail beyond the scope of the
 initial question. Similarly, Detective Rimmer asked Niemeyer
 open-ended questions throughout the interrogation, and she
 again responded in narrative form. Moreover, as soon as he
 entered the interrogation room, Detective Rimmer told
 Niemeyer that she was not under arrest. This weighs against
 custody. Cf. id. at ¶ 28, 524 P.3d at 1192
 (stating that, when officers told Willoughby three times that
 he was under arrest,
 
 14
 
 this significantly weighed in favor of custody because courts
 "place great weight on whether police tell a suspect
 that they are under arrest").
 
 
          b.
 Officers' Tone of Voice and General Demeanor
 
 
          ¶27
 Interrogations held in measured, conversational tones weigh
 against a finding of custody. Davis, ¶¶
 33-34, 449 P.3d at 741. Here, both Officer Roland and
 Detective Rimmer largely maintained a calm and informal
 demeanor throughout the encounter. Both officers kept a
 conversational tone, often sympathizing with Niemeyer at
 different times during the evening. Although Officer Roland
 did sternly rebuke Niemeyer when she tried to remove the bags
 from her hands, their interactions remained cordial
 otherwise. Detective Rimmer remained calm and measured at all
 times; when Niemeyer first asked him if she had shot M.F., he
 evenly replied, "I don't know, that's what
 I'm here to find out."
 
 
          c.
 Length and Mood of the Interrogation
 
 
          ¶28
 Shorter interrogations are more akin to investigatory stops
 and weigh against custody. Davis, ¶ 36, 449
 P.3d at 741. And while we have declined to set forth a strict
 time limitation, encounters less than thirty minutes weigh
 against custody, while those closer to or exceeding ninety
 minutes weigh in favor of custody. Willoughby,
 ¶ 33, 524 P.3d at 1193.
 
 
          ¶29
 Here, Detective Rimmer's interrogation lasted less than
 thirty minutes, but Niemeyer was in the interrogation room
 for closer to ninety minutes and under
 
 15
 
 police supervision for nearly two hours before her arrest. On
 their own, these facts lean in favor of custody. See
 Cline, ¶ 31, 439 P.3d at 1239 (finding that
 Cline's entire encounter with police, which lasted over
 ninety minutes, was relevant to a custody determination even
 though the actual interrogation was brief). However, the
 encounter's length must be considered along with the
 overall mood of the interrogation.
 
 
          ¶30
 Interrogations that are aggressive or accusatory weigh in
 favor of custody, whereas those that are informal and
 conversational weigh against custody. Davis,
 ¶¶ 33-34, 449 P.3d at 741. Here, when the
 interrogation with Detective Rimmer started, Niemeyer calmly
 described the earlier events of the day. As they began to
 discuss what happened in the motel room, Niemeyer became
 increasingly distressed and sobbed at times. Detective Rimmer
 responded in a measured manner, never escalating the mood of
 the interrogation. Even when Niemeyer repeatedly stated that
 she thought she had shot M.F., Detective Rimmer remained
 even-tempered; he never accused her of shooting M.F. Instead,
 he merely continued asking clarifying questions. Cf.
 People v. Klinck, 259 P.3d 489, 494 (Colo. 2011) (noting
 that nonconfrontational questions weigh against custody).
 
 
          ¶31
 To be sure, a defendant's emotional distress can signify
 custody, and Niemeyer was distraught at times. See
 Effland, 240 P.3d at 875 (weighing the
 
 16
 
 defendant's distress in favor of a finding of custody).
 But Detective Rimmer's calm responses, coupled with the
 overall mood of the interrogation, minimizes this fact.
 
 
          ¶32
 As discussed above, based on the total amount of time
 Niemeyer was under police supervision, we find that the
 length of the encounter leans in favor of custody. However,
 we believe that the calm, nonconfrontational mood of the
 interrogation slightly outweighs these facts. Thus, we
 conclude that on balance, this factor weighs against custody.
 
 
          2.
 Factors Weighing in Favor of Custody
 
 
          ¶33
 Now we turn to those factors that weigh in favor of Niemeyer
 being in custody at the time of the interview: the time,
 place, and purpose of the encounter; the persons present
 during the interrogation; limitations of the defendant's
 movement or other forms of restraint; the officers'
 response to any questions asked by the defendant; directions
 given to the defendant during the interrogation; and the
 defendant's verbal or nonverbal response to those
 directions.
 
 
          a.
 Time, Place, and Purpose of the Encounter
 
 
          ¶34
 Encounters that take place at night weigh in favor of
 custody, as do those that occur in a
 "police-dominated" location. See
 Willoughby, ¶ 23, 524 P.3d at 1192 (stating that
 daylight encounters weigh against custody); Cline,
 ¶ 21, 439 P.3d at 1238 (stating that a
 "police-dominated" location weighs in favor of
 custody). Officer Roland transported Niemeyer to the police
 station around 11 p.m., and the
 
 17
 
 interrogation began just before midnight in an interrogation
 room. These facts weigh in favor of custody.
 
 
          ¶35
 As to purpose, there is a wide spectrum of encounters that
 police may have with the public. The dispatch of police in
 response to a crime weighs in favor of custody.
 Effland, 240 P.3d at 875 (concluding that the
 purpose of the encounter was to investigate a suspect in a
 criminal investigation, which weighed in favor of custody).
 Conversely, the dispatch of police for the general public
 welfare or safety weighs against custody. Bohler,
 ¶ 21, 545 P.3d at 515 (concluding the context of a
 welfare check weighs against custody).
 
 
          ¶36
 The purpose of the encounter here doesn't neatly fall
 onto either side of the spectrum. At first, officers were
 dispatched in response to a potential crime. Once they
 arrived on the scene, the purpose changed to the
 investigation of an attempted suicide. And once Niemeyer
 asked Detective Rimmer if she had shot her husband ("So
 what we got going on, did I shoot him?"), the purpose of
 the encounter shifted yet again. Though the purpose of the
 encounter changed throughout the evening, its timing and
 place-at night and in a police interrogation room-tip the
 scale in favor of custody.
 
 
          b.
 Persons Present During the Interrogation
 
 
          ¶37
 When a defendant is alone with police during an encounter or
 there is a lack of a "representative or neutral
 party" during an interrogation, that weighs in favor
 
 18
 
 of custody. Willoughby, ¶ 26, 524 P.3d at 1192
 (quoting People v. Padilla, 2021 CO 18, ¶ 23,
 482 P.3d 441, 447). Niemeyer was alone with Detective Rimmer
 during the entirety of the interrogation. In fact, after the
 victim advocate asked if he should stay in the room,
 Detective Rimmer dismissed him. These facts weigh in favor of
 custody.
 
 
          c.
 Limitations Placed on Niemeyer's Movements and Other
 Forms of Restraint
 
 
          ¶38
 If an officer unholsters a gun or uses physical restraint to
 detain a citizen, the encounter is more likely to be deemed
 custodial. People v. Breidenbach, 875 P.2d 879, 886
 (Colo. 1994). More specifically, physical restraints like
 handcuffs are typically associated with formal arrest and
 indicate custody. Cline, ¶ 18, 439 P.3d at
 1237. And beyond physical restraints, other limitations on a
 suspect's movement during an interrogation can also
 indicate custody. Willoughby, ¶ 36, 524 P.3d at
 1194. For example, an interrogation that takes place in a
 small room with a closed door can be an indicator of custody.
 People v. Minjarez, 81 P.3d 348, 356 (Colo. 2003).
 
 
          ¶39
 Here, the nature of the limitations on Niemeyer's
 movements evolved throughout her encounter with police. When
 Officer Roland arrived on the scene, he restricted
 Niemeyer's movements-initially so first responders could
 tend to M.F. and later so officers could process the scene.
 The ongoing emergency dictated
 
 19
 
 the need for Officer Roland's actions. See
 Bohler, ¶¶ 30, 33, 545 P.3d at 516-17 (stating
 that officer requests related to safety are not indicative of
 custody).
 
 
          ¶40
 Next, Officer Roland drove Niemeyer to the station in his
 police car, where she rode uncuffed in the backseat. As soon
 as they arrived at the police station, Officer Roland
 escorted Niemeyer to the interrogation room and placed
 plastic bags over her hands, securing them with zip ties.
 Niemeyer attempted to take the bags off several times, yet
 Officer Roland, the victim advocate, and Detective Rimmer all
 stopped her from doing so. When Niemeyer complained of her
 discomfort with the bags, the officers indicated that she had
 no choice but to keep them on. Niemeyer said several times
 that she was uncomfortable and wanted to remove the bags, at
 one time exclaiming, "these are driving me crazy.... I
 just want to go see my husband."
 
 
          ¶41
 Certainly, the use of zip ties here doesn't equate to
 handcuffs: Niemeyer's hands were not bound together, and
 she could still move her arms freely. However, when coupled
 with the plastic bags, they still qualify as physical
 restraints. Moreover, the officers placed these restraints on
 Niemeyer's hands as soon as she arrived at the police
 station, prevented her from removing them, and kept them on
 her hands for close to an hour until Detective Rimmer removed
 them when the interrogation began.
 
 20
 
          ¶42
 Niemeyer's movements were also curtailed while she was in
 the interrogation room: Detective Rimmer closed the door
 before starting the interrogation, and she was escorted at
 all times throughout the police station. And, due to her
 intoxication, Niemeyer could not transport herself to the
 hospital. Cf. Willoughby, ¶ 36, 524 P.3d at
 1194 (stating that where the defendant freely paced around
 his apartment smoking a cigar during an interrogation, it
 strongly weighed against custody). Therefore, the limitations
 placed on Niemeyer's movements and the presence of the
 plastic bags on her hands weigh in favor of custody.
 
 
          d.
 Officers' Response to Niemeyer's Questions
 
 
          ¶43
 Shortly after first responders transported M.F. to the
 hospital, Niemeyer began asking Officer Roland when he could
 take her there. Later, while at the station, she repeatedly
 asked Officer Roland and Detective Rimmer if she could go to
 the hospital and what they knew about M.F.'s condition.
 Neither Officer Roland nor Detective Rimmer heeded her
 requests, instead responding with variations of
 "We've got to do this first" and "I'll
 work on trying to get you up there." A reasonable person
 would expect an update on transportation at some point during
 their encounter with police. Thus, a reasonable person in
 Niemeyer's position could conclude, based on the
 officers' response, that their freedom of action was
 curtailed. Therefore, this factor weighs in favor of custody.
 
 21
 
          e.
 Directions Given to Niemeyer
 
 
          ¶44
 Commands from officers weigh in favor of custody.
 Bohler, ¶ 32, 545 P.3d at 517. But requests
 from officers to move a defendant out of harm's way or
 for safety reasons do not rise to the level of commands.
 See id. Niemeyer was under police supervision from
 the time officers arrived on the scene until her arrest. As
 soon as he arrived at the motel, Officer Roland gave Niemeyer
 numerous directions to secure the scene and to transport her
 to the police station. These initial directions fall much
 closer to "requests" than commands, as they were
 intended to keep Niemeyer safe and allow officers and first
 responders to do their jobs.
 
 
          ¶45
 However, these directions became "commands" when
 Officer Roland placed the bags on Niemeyer's hands in the
 interrogation room. Officer Roland did not ask permission to
 do so and kept Niemeyer from removing the bags several times.
 Detective Rimmer also directed Niemeyer to keep the bags on
 her hands. And, both officers were stern and authoritative
 when instructing her not to remove them.
 
 
          f.
 Niemeyer's Response to the Officers'
 Directions
 
 
          ¶46
 Last, a defendant's full compliance with officer
 directions indicates custody. See id. at ¶ 34,
 545 P.3d at 517. Niemeyer complied with all of Officer Roland
 and Detective Rimmer's directions while under police
 supervision. Though she did
 
 22
 
 try to take the plastic bags off her hands and expressed
 frustration that the police would not take her to the
 hospital, she otherwise obeyed instructions despite her
 strong desire to see her husband. This signifies that police
 were depriving her of her freedom of movement and weighs in
 favor of custody.
 
 
          3.
 Evaluating the Matheny
 Factors
 
 
          ¶47
 Now, we will evaluate the totality of the circumstances. As
 discussed, we recognize that the following facts weigh
 against a finding of custody: (1) Detective Rimmer told
 Niemeyer she was not under arrest, and both officers asked
 her open-ended questions to which she provided long-form
 narrative responses; (2) officers maintained a calm and
 informal demeanor throughout the encounter with Niemeyer; and
 (3) the interview lasted less than thirty minutes, and the
 mood of the interrogation remained relaxed and conversational
 even in the face of Niemeyer's distress.
 
 
          ¶48
 Conversely, the following facts weigh in favor of finding
 that Niemeyer was in custody: (1) the interrogation took
 place at the police station, in a closed interrogation room,
 near midnight; (2) Niemeyer was alone in the interrogation
 room with Detective Rimmer; (3) police placed bags on
 Niemeyer's hands and secured them with zip ties, and they
 restricted her movements in the police car and at the
 station; (4) Niemeyer repeatedly asked to go to the hospital
 to see her husband, but the police demurred her every
 request; (5) officers commanded
 
 23
 
 Niemeyer to keep the bags on her hands; and (6) despite a
 strong desire to go to the hospital, Niemeyer complied with
 all of the officers' directions.
 
 
          ¶49
 After reviewing the totality of circumstances, we conclude
 that a reasonable person in Niemeyer's position would
 consider themselves to be deprived of their freedom of action
 to a degree associated with a formal arrest. While numerous
 facts weigh in favor of custody, we find the following to be
 the most salient: (1) Niemeyer was alone, late at night, in
 an interrogation room with a detective at the police station;
 (2) she continuously asked, for over ninety minutes, to be
 taken to the hospital to see her husband (who at the very
 least had a severe head injury), but officers refused to take
 her there and repeatedly rebuffed her requests; and (3)
 officers restricted her freedom of movement throughout the
 encounter and affixed bags with zip ties to her hands while
 in the interrogation room. Importantly, Niemeyer wasn't
 merely asking to go home, or simply to be released; she was
 asking to go to the hospital to be with her husband, who had
 been shot in the head. Keeping a person at the police station
 and refusing to take them to see their severely injured
 spouse is strongly indicative of custody. And while zip-tied
 bags are not handcuffs, they imply formal arrest more so than
 if Niemeyer had sat in the interrogation room entirely
 unrestrained. Coupled with the fact that she was alone with
 Detective Rimmer in the interrogation room late at night and
 had no other means of transportation, these conditions
 demonstrate that the police
 
 24
 
 effectively prevented Niemeyer from leaving in a way that
 restricted her freedom of action to a degree associated with
 a formal arrest. Thus, we conclude that Niemeyer was in
 police custody at the time of her interrogation with
 Detective Rimmer. Therefore, because Niemeyer was subjected
 to custodial interrogation without receiving the requisite
 Miranda warnings, the trial court should have
 granted her motion to suppress.
 
 
          D.
 The Trial Court's Suppression Ruling Did Not Constitute
 Harmless Error
 
 
          ¶50
 Even though we have determined that Niemeyer's statements
 during the interrogation were improperly admitted, this does
 not end our inquiry. We still must apply the constitutional
 harmless error standard to determine whether the trial
 court's error was "harmless beyond a reasonable
 doubt." Hagos, ¶ 11, 288 P.3d at 119
 (quoting Chapman, 386 U.S. at 24). Under this
 standard, if there is a reasonable possibility that the error
 might have contributed to the conviction, we must reverse.
 Id.
 
 
          ¶51
 The People contend that any error was harmless because
 Niemeyer's statements were cumulative of other evidence.
 Specifically, the People argue that circumstantial
 evidence-i.e., Niemeyer's initial statements to Officer
 Roland at the scene; the manner in which M.F. was shot; and
 the victim advocate's testimony that Niemeyer admitted to
 him that she pulled the trigger-mirrored evidence from the
 interrogation. The People also argue that Niemeyer's
 testimony at trial
 
 25
 
 corroborated the prosecution's theory of the case, and
 that her statements to Detective Rimmer would have been
 admitted as impeachment evidence. We disagree.
 
 
          ¶52
 After reviewing the record, we conclude that the statements
 made by Niemeyer during the interrogation constituted the
 bedrock of the prosecution's case. The prosecution
 introduced Niemeyer's admissions to Detective Rimmer as
 essential to its argument during opening statements-"You
 will hear her say that she is the one that shot
 him."-and continued this theme throughout the trial.
 Thus, the prosecution layered the remainder of its evidence
 atop the critical fact that Niemeyer confessed to police on
 the night of the incident: Her incriminating statements laid
 the foundation for the rest of the case.
 
 
          ¶53
 More importantly, at no point aside from the interrogation
 did Niemeyer affirmatively say that she had shot M.F. It was
 only in her interrogation with Detective Rimmer that Niemeyer
 stated several times that she believed she may have
 shot M.F., culminating in her affirmative statements that she
 did shoot M.F. No other evidence admitted was nearly
 as inculpatory as Niemeyer's statements to Detective
 Rimmer.
 
 
          ¶54
 Additionally, the People's argument that Niemeyer's
 testimony at trial renders the statements cumulative is
 misplaced. Quite the opposite: Niemeyer's testimony
 contradicted her admitted statements to Detective
 Rimmer. On the
 
 26
 
 stand, she stated several times that she did not shoot M.F.
 She explained that the discrepancy in her statements existed
 because she was in shock that night, confused as to what had
 happened, and was "not mentally there."
 
 
          ¶55
 Finally, the People's claim that Niemeyer's
 statements to Detective Rimmer would have been admitted
 regardless as impeachment evidence based on her testimony is
 flawed. While we cannot speculate as to Niemeyer's state
 of mind, she may very well have testified precisely
 because the statements were admitted into
 evidence-not in spite of them. If the statements had been
 suppressed, she might not have felt compelled to testify. And
 if she had not testified, there would have been no
 opportunity for impeachment.
 
 
          ¶56
 Thus, we conclude that there is at least a reasonable
 possibility that the trial court's error contributed to
 Niemeyer's conviction. Id. As a result, we must
 reverse.
 
 
          III.
 Conclusion
 
 
          ¶57
 We hold that Niemeyer was in custody at the time of the
 interrogation with Detective Rimmer, and her statements
 should have been suppressed. Therefore, we reverse the
 judgment of the court of appeals and remand for further
 proceedings consistent with this opinion.
 
 
 ---------
 
 
 Notes:
 
 
 [1] We granted certiorari to review the
 following issue:
 
 
 1. Whether an accused is in custody where she is
 intoxicated, without transportation, required to undergo
 testing, and under the supervision and direction of police
 who refuse to consider her requests to leave until she
 submits to testing and interrogation.
 
 
 [2] Officer Roland's body-worn camera
 recorded his interactions with Niemeyer.
 
 
 [3] The rifle had a shorter than standard
 barrel.
 
 
 [4] In Craig, the police station is known
 as the "Public Safety Center." We refer to it here
 as the police station.
 
 
 ---------