23CA1699 Peo v Drake 08-07-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1699
Weld County District Court No. 22CR355
Honorable Meghan Patrice Saleebey, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Dakota Drake,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUSTICE MARTINEZ*
Pawar and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 7, 2025

---

Philip J. Weiser, Attorney General, Allison S. Block, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Joseph Paul Hough, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Dakota Drake appeals his conviction of sexual assault. We affirm.

## I.    Background

¶ 2    On the night of the assault, M.S. went to a parking lot party for a "truck meet" that had around fifty people in attendance. M.S. met Drake for the first time at the truck meet when he accepted her offer to briefly leave the party to get food from a fast-food restaurant.

¶ 3    After returning to the truck meet, Drake said he needed to use the restroom, and M.S. followed him to also use "the restroom after he went." When M.S. left the restroom, she saw Drake "on the grass side of the fence[d]" parking lot where the truck meet was occurring. She walked over to meet him, and while the two were talking, Drake "leaned in to kiss" M.S., who, in response, "put [her] arms up" and said, "[N]o." Then, Drake's shirt "ended up on the ground," and "he kind of moved [M.S.] to the ground" so that she was lying on her back on his shirt.

¶ 4    M.S. said no multiple times to Drake while he worked to "pull [M.S.'s pants] down." When Drake got M.S.'s pants "down around [her] knees," he positioned himself "on his knees and between

1

[M.S.'s] legs" and started touching M.S.'s vagina with his fingers. Then, Drake penetrated M.S.'s vagina with his penis. When Drake "came out" of M.S.'s vagina, M.S. "was finally able to get up," so she "pulled [her] pants up and [she] ran towards the parking lot" of the truck meet.

¶ 5    Once in the crowd of partygoers, M.S. asked an acquaintance to call Lexi Inskeep, M.S.'s friend, so Inskeep could pick M.S. up from the truck meet. After picking up M.S., Inskeep drove her to a hospital where M.S.'s mother met them.

¶ 6    A sexual assault nurse examiner (SANE) examined M.S. at the hospital. M.S. told the SANE that she would like to talk to the police about the assault. When speaking with officers, M.S. identified Drake as her attacker and described his appearance.

¶ 7    Sergeant Erin Gooch, Officer Edward Kubala, and Officer Lindsay Deming went to the parking lot where the truck meet occurred. The three officers found two men sleeping inside the cabin of a truck and Drake sleeping in the bed of that truck. Officer Kubala questioned Drake, and Officer Deming "transported [Drake] to the Greeley Police Department" (the station) so Detective Jackson

Brunmeier, the lead detective on M.S.'s assault case, could speak with Drake further.

¶ 8     Detective Brunmeier interviewed Drake at the station.  Under a warrant for the collection of nontestimonial evidence, officers collected buccal swabs and blood from Drake to complete a male sexual assault kit.

¶ 9     After the sexual assault kits were processed, about seven months later, Drake was charged with sexual assault through the application of physical force or physical violence, in violation of section 18-3-402(1)(a), (4)(a), C.R.S. 2021, a class 3 felony.

¶ 10    A jury convicted Drake as charged, and the court sentenced Drake to 270 days of work release with an ankle monitor and twenty years to life on sex offender probation and ordered his registration as a sex offender.

¶ 11    In his opening brief, Drake says that, after he violated the terms of his probation, which was subsequently revoked, he was resentenced to a term of eight years to life in the custody of the Department of Corrections.  This appeal followed.

¶ 12    Drake contends that the trial court reversibly erred by failing to grant his motion to suppress his incriminating statements

allegedly gathered in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and allowing the prosecution's generalized expert to offer testimony that improperly bolstered M.S.'s credibility and claims. In addition, Drake asserts that the trial court reversibly erred by instructing the jury that "self-induced intoxication" could not be considered and that the prosecutor's argument on the issue was misconduct. Lastly, Drake argues that the errors he raises on appeal warrant reversal under the doctrine of cumulative error.

## II.    Analysis

### A.    Drake's Motion to Suppress

#### 1.    Standard of Review

¶ 13    A court's "determination that an individual was in custody for purposes of *Miranda* presents a mixed question of law and fact." *People v. Willoughby*, 2023 CO 10, ¶ 18, 524 P.3d 1186, 1191. We defer to the court's "factual findings when there is competent evidence in the record to support them." *Id.* "However, we may also rely upon undisputed facts in the record and 'independently review audio-recorded interrogations.'" *Id.* (quoting *People v. Padilla*, 2021 CO 18, ¶ 14, 482 P.3d 441, 445); *see also People v. Kutlak*, 2016 CO

1, ¶ 12, 364 P.3d 199, 203. "We review the legal effect of those facts de novo." *Willoughby*, ¶ 18, 524 P.3d at 1191.

¶ 14 The parties agree that Drake preserved this issue. We "review trial errors of constitutional dimension that were preserved by objection for constitutional harmless error." *Hagos v. People*, 2012 CO 63, ¶ 11, 288 P.3d 116, 119. "These errors require reversal unless the reviewing court is 'able to declare a belief that [the error] was harmless beyond a reasonable doubt.'" *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). "In other words, we reverse if 'there is a reasonable *possibility* that the [error] might have contributed to the conviction.'" *Id.* (quoting *Chapman*, 386 U.S. at 24).

### 2. Additional Facts

¶ 15 As mentioned, after M.S. identified Drake as her attacker and described his appearance to police, officers went to the truck meet's parking lot and found Drake sleeping in the bed of a parked truck. Once Drake was awake, Officer Kubala asked him to identify himself, explain why he was at the parking lot, name the people he had been with the night before, and confirm whether he had been drinking. After Drake answered that he had been drinking, Officer

Kubala asked "if [Drake] would do [him] a favor" and ride in Officer Deming's car to the station where Detective Brunmeier could interview Drake as a witness to the truck meet. Drake agreed to accept a ride to the station.

¶ 16 Once at the station, Detective Brunmeier questioned Drake, and officers collected buccal swabs and a blood draw and administered a male sexual assault kit. Drake was released from the station about eight hours after the police first contacted him.

### 3. The Court Did Not Err in Its *Miranda* Analysis

¶ 17 Drake contends that "he was clearly detained in some form of arrest-like custody," and therefore, "*Miranda*'s mandated procedures should have been followed"; thus, the court "erroneously concluded that [a] *Miranda* advisement and waiver was unnecessary." We disagree.

¶ 18 Under the United States Constitution, no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Before any questioning, an accused person "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or

6

appointed." *Miranda,* 384 U.S. at 444. "But when a suspect is not in custody, *Miranda* warnings are not required." *People v. Bohler,* 2024 CO 18, ¶ 18, 545 P.3d 509, 514.

¶ 19    "To determine whether an individual is in custody for purposes of *Miranda,* 'the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Willoughby,* ¶ 20, 524 P.3d at 1191 (quoting *California v. Beheler,* 463 U.S. 1121, 1125 (1983)). This ultimate inquiry "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* (quoting *Stansbury v. California,* 511 U.S. 318, 323 (1994)). "Accordingly, courts must look to the totality of the circumstances to determine whether an individual was in custody." *Id.* at ¶ 21, 524 P.3d at 1191. Some of the factors a court should consider in determining the totality of the circumstances include the following:

> (1)   the time, place, and purpose of the encounter;
>
> (2)   the persons present during the interrogation;

(3)    the words spoken by the officer to the defendant;

(4)    the officer's tone of voice and general demeanor;

(5)    the length and mood of the interrogation;

(6)    whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation;

(7)    the officer's response to any questions asked by the defendant;

(8)    whether directions were given to the defendant during the interrogation; and

(9)    the defendant's verbal or nonverbal response to such directions.

*Mumford v. People*, 2012 CO 2, ¶ 13, 270 P.3d 953, 957 (quoting *People v. Matheny*, 46 P.3d 453, 465-66 (Colo. 2002)).

¶ 20    By weighing these factors and considering the totality of the circumstances, we conclude that Drake was not in custody and, therefore, not subject to a custodial interrogation.

¶ 21    Although the three officers went to the truck meet's parking lot based on M.S.'s report that she was sexually assaulted at that location the night before, *see Niemeyer v. People*, 2024 CO 58, ¶ 35, 555 P.3d 607, 617 (explaining that an encounter with the purpose "to investigate a suspect in a criminal investigation" weighs in favor

of custody and that "the dispatch of police for the general public welfare or safety weighs against custody"), within the first two minutes of the officers arriving at the parking lot, Officer Kubala told Drake, "No one [was] in trouble," *see Matheny*, 46 P.3d at 467 (holding that the defendant was not in custody because officers told the defendant that "he was not under arrest" and that "he was free to go at any[ time]"). In addition, at the station, Drake asked Detective Brunmeier if he was under arrest or detained, and Detective Brunmeier, who was unarmed and not wearing a uniform, said: "Detained . . . you're not under arrest. . . . Just detained until they get the search warrant stuff done." *See Mumford*, ¶ 16, 270 P.3d at 957 (concluding that the defendant's "temporary detention during the execution of . . . warrants was consistent with the Fourth Amendment" and under the totality of the circumstances, the defendant's "temporary detention [did] not escalate[] to the point that an objective, reasonable person in [the defendant]'s position would feel restrained to a degree associated with a formal arrest" and holding that no *Miranda* warnings were required). Thus, Officer Kubala's and Detective Brunmeier's words and responses to Drake weigh against a finding that Drake was in custody.

¶ 22    Further, even though Drake spent about five and a half hours in the interview room at the station, *see Niemeyer*, ¶ 28, 555 P.3d at 616 (explaining that interrogations that are "closer to or exceeding ninety minutes weigh in favor of custody"); *Willoughby*, ¶ 33, 524 P.3d at 1193 ("A lengthy interrogation may indicate custody."), no one handcuffed Drake or restrained him in a manner related to a formal arrest, *see People v. Clark*, 2020 CO 36, ¶ 33, 500 P.3d 356, 362 (discussing cases that held that "the absence of handcuffs or other restraints" suggested "that the suspect was not in custody"). Moreover, Drake left the station without being arrested. Accordingly, Drake's limitation of movement weighs against a finding that he was in custody.

¶ 23    In addition, while Detective Brunmeier questioned Drake at the station, *see People v. Cline*, 2019 CO 33, ¶ 21, 439 P.3d 1232, 1238 (noting that "*Miranda* warnings were expressly developed as an added protection against 'incommunicado interrogation of individuals in a police-dominated atmosphere,'" such as a police station (quoting *People v. Figueroa-Ortega*, 2012 CO 51, ¶ 7, 283 P.3d 691, 693)), Drake expressly agreed to do Officer Kubala a

"favor" and ride with Officer Deming to the station to continue his questioning.

¶ 24    In sum, although the purpose of questioning Drake was to investigate a suspect in a criminal investigation and the period of time Drake spent at the station was lengthy, Drake was told more than once that he was not under arrest, was never restrained in a manner related to a formal arrest, and voluntarily agreed to do Officer Kubala a "favor" and continue to be questioned at the station.

¶ 25    Thus, the trial court properly denied Drake's motion to suppress his statements to officers and Detective Brunmeier on the day after the assault.  *See Willoughby*, ¶ 20, 524 P.3d at 1191.  Accordingly, we affirm the trial court's decision to deny Drake's motion to suppress.

### B.    The Generalized Expert's Testimony

#### 1.    Standard of Review

¶ 26    "We review a trial court's admission of expert testimony for an abuse of discretion and will reverse only when that decision is manifestly erroneous."  *People v. Cooper,* 2021 CO 69, ¶ 44, 496 P.3d 430, 439 (quoting *People v. Rector,* 248 P.3d 1196, 1200 (Colo.

11

2011)); *see also People v. Coons*, 2021 CO 70, ¶ 41, 495 P.3d 961, 969. "This is a deferential standard that reflects the superior opportunity a trial court has to assess both the competence of an expert witness and whether that witness's anticipated opinions would be helpful to the jury." *Cooper*, ¶ 44, 496 P.3d at 439; *see also Coons*, ¶ 41, 495 P.3d at 969.

¶ 27    The parties agree that Drake did not preserve this issue for appeal. We review all errors "that were not preserved by objection for plain error." *Hagos*, ¶ 14, 288 P.3d at 120. Plain error is obvious and substantial, and we reverse under plain error only if "the error 'so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'" *Id.* (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

## 2.    Additional Facts

¶ 28    During the trial, at the prosecution's request, the trial court qualified Jean McAllister as an expert in sexual assault victim dynamics and behaviors. McAllister testified that she had a bachelor's degree and a master's degree and received training "at least every month." She said her professional work related to

interpersonal violence, including sexual assault, child abuse, child sexual abuse, and intimate partner violence and that she had worked with over seven thousand trauma victims.

¶ 29    Before McAllister began her expert testimony, she confirmed that she did not know M.S. or Drake.  She also explained to the jury what sources she used to develop her testimony: "I'll be relying on my direct experience over the years[] — my work with other colleagues who do this kind of work in programs that I consult with, and on the research literature and my training and education."  In addition, McAllister informed the jury that she testified for anyone who respected her requirements that her testimony was "based on [her] knowledge, experience, and training" and that her testimony was not "based on what anybody want[ed] [her] to say in any particular setting."  Next, McAllister described the "basic information" that she consistently utilized to prepare to testify in a case:

> I need to know the type of case for instance —
> it's a sex assault.  I need to know if it's a peer
> adult age sex assault or if it's a sexual assault
> on a child because the dynamics can be very
> different.  I need to know the gender of the
> victim because people behave differently based

13

on gender when they've been sexually assaulted.

¶ 30     Then, the prosecutor requested that McAllister focus her testimony on a sexual assault scenario where there was "no preexisting relationship" between the parties at the time when one assaulted the other, what McAllister called an "acquaintance sexual assault." Under such focus, the prosecutor asked McAllister if sexual assaults happen when other people are nearby and "could stumble upon" the assault, to which McAllister replied that such assaults were ubiquitous, "especially in young adult and older [teenage] groups." In addition, McAllister explained how alcohol can impact the person who perpetrates an acquaintance sexual assault and the victim of such assault.

¶ 31     Most of McAllister's testimony focused on the various trauma responses that a sexual assault victim may manifest before, during, and after an acquaintance sexual assault. Further, McAllister described the physical and emotional consequences that a victim of such assault may experience. But McAllister never discussed M.S. or the credibility of her accusations against Drake.

### 3. The Court Did Not Abuse Its Discretion by Admitting McAllister's Expert Testimony

¶ 32    Drake contends that the trial court abused its discretion by admitting McAllister's testimony because it "impermissibly bolster[ed] M.S.'s credibility and claims of assault."  We disagree.

¶ 33    "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  CRE 702.

¶ 34    Generalized expert testimony is "testimony aimed at educating the jury about general concepts or principles without attempting to discuss the particular facts of the case."  *Cooper*, ¶ 1, 496 P.3d at 432; *see also Coons*, ¶ 1, 495 P.3d at 963.  Such testimony "may not bolster the credibility of a victim by impermissibly implying that she is telling, or has previously told, the truth about the charged incident."  *Cooper*, ¶ 95, 496 P.3d at 447; *see also* CRE 608(a); *People v. Whitman*, 205 P.3d 371, 383 (Colo. App. 2007).

¶ 35    However, "an expert may testify concerning whether a sexual assault victim's behavior or demeanor was consistent with the

typical behavior of victims of abuse." *People v. Marx*, 2019 COA 138, ¶ 15, 467 P.3d 1196, 1202; *see also People v. Relaford*, 2016 COA 99, ¶ 28, 409 P.3d 490, 496 (explaining that an expert's testimony as to the typical demeanor and behavioral traits displayed by a sexual assault victim is "generally admissible because it assists the jury in understanding the victim's behavior after the incident"). "While such 'testimony may incidentally give rise to an inference that a victim is or is not telling the truth about the specific incident,' 'this fact alone is insufficient to deny admission of the evidence, because expert testimony generally tends to bolster or attack the credibility of another witness.'" *Relaford*, ¶ 30, 409 P.3d at 496 (quoting *People v. Koon*, 724 P.2d 1367, 1370 (Colo. App. 1986)).

¶ 36 Thus, generalized expert testimony is admissible when it "(1) relates to an issue apart from credibility and (2) only incidentally tends to corroborate a witness's testimony." *Id.* at ¶ 31, 409 P.3d at 496 (quoting *People v. Cernazanu*, 2015 COA 122, ¶ 20, 410 P.3d 603, 607).

¶ 37 Drake contends that "while McAllister never explicitly testified that M.S. and her accusations were credible, she might as well

have, as the effect of her testimony was just the same." We disagree.

¶ 38 To support his contention, Drake argues that McAllister's testimony was improper because it "track[ed]" M.S.'s testimony that, at the time of the assault, M.S. and Drake "were both 'young adults' and 'acquaintances[s]' who met in a 'safe environment.'" Yet, McAllister explained what information she requires to provide relevant testimony to a case; she must know the broad circumstances of the sexual assault because such circumstances can produce "very different" dynamics in a victim's response to being sexually assaulted.

¶ 39 In addition, Drake asserts that the trial court should not have admitted McAllister's testimony because "it was irrelevant, highly prejudicial, and improperly invaded the province of the jury." He claims that "McAllister's testimony boiled down to this: Because M.S.'s highly specific experiences matched exactly with the experiences of thousands of other reliable sexual assault victims, M.S. must then be telling the truth." However, McAllister's testimony did not improperly invade the province of the jury because it described in *general terms* the typical reactions of sexual

17

assault victims and how the relationship between victims and perpetrators can impact a victim's response. *See Relaford*, ¶ 33, 409 P.3d at 496. Accordingly, McAllister's testimony "only incidentally tend[ed] to corroborate [M.S.]'s testimony." *Id.* at ¶ 31, 409 P.3d at 496.

¶ 40 Further, McAllister's generalized expert testimony about sexual assault "did not touch upon the truthfulness of [M.S.]'s version of events." *Cooper*, ¶ 97, 496 P.3d at 448. McAllister also never testified about the infrequency of women falsely reporting sexual assault, testimony that could have improperly bolstered M.S.'s credibility. *See People v. Snook*, 745 P.2d 647, 649-50 (Colo. 1987). Moreover, McAllister did not include in her testimony any hypotheticals that she closely tailored to the distinctive facts of this case. *See People v. Collins*, 2021 COA 18, ¶ 67, 491 P.3d 438, 450 ("When a hypothetical is so closely tailored to the distinctive facts of the case at hand, . . . the [testimony] ceases to be about any [victim] and, instead, becomes a question about the particular [victim].).

¶ 41 Instead, McAllister's testimony on the dynamics of sexual assault victims around the time of an assault could have assisted the jury in understanding, for example, M.S.'s inability to move

during the assault; M.S.'s subdued reaction when she returned to the truck meet after the assault; and M.S.'s decision to leave the truck meet and go to the hospital rather than a police station. Thus, McAllister's testimony related "to an issue apart from [M.S.'s] credibility." *Relaford*, ¶ 31, 409 P.3d at 496 (quoting *Cernazanu*, ¶ 20, 410 P.3d at 607).

¶ 42 Accordingly, we conclude that the trial court did not abuse its discretion in admitting McAllister's generalized expert testimony.

### C. Evidence of Self-Induced Intoxication

#### 1. Standard of Review

¶ 43 "We review de novo whether jury instructions accurately reflect the law." *People v. Stone*, 2020 COA 23, ¶ 54, 471 P.3d 1148, 1157. We review a court's "decision regarding a particular jury instruction for an abuse of discretion and will not disturb the court's decision unless it is manifestly arbitrary, unreasonable, or unfair." *People v. Cuevas*, 2024 COA 84, ¶ 36, 558 P.3d 1041, 1049.

¶ 44 The parties agree that Drake did not preserve this issue for appellate review. Thus, we review the issue for plain error. *See Hagos*, ¶ 14, 288 P.3d at 120. As mentioned, plain error is obvious

and substantial, and we "reverse under plain error review only if the error 'so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'" *Id.* (quoting *Miller*, 113 P.3d at 750).

## 2. Additional Facts

¶ 45 At trial, the jury heard from several witnesses about Drake's intoxication, including whether he was slurring his words or showing other signs of intoxication and how many drinks he had that night.

¶ 46 During the jury instruction conference, the parties compared an instruction offered by the prosecution to the Colorado model criminal jury instructions, COLJI-Crim. H:34 (2024); COLJI-Crim. F:330 (2024), and discussed the terms "self-induced" versus "voluntary." While the trial court considered the prosecution's instruction, the prosecutor said multiple times that the proposed instruction was fair to Drake because it emphasized the prosecution's "burden to demonstrate [that Drake acted] knowingly."

¶ 47 After these discussions, the parties agreed on a final version of the intoxication instruction that the trial court had drafted by

modifying the prosecution's proposed instruction. The instruction

the trial court gave read:

> Throughout this case you have heard evidence that [Drake] was consuming alcohol on the date these allegations are reported to have occurred.
>
> You are instructed that [Drake]'s self-induced intoxication is not a defense to the crime of sexual assault — overcoming the victim's will. In determining whether or not the element of "knowingly" has been proved beyond a reasonable doubt, you may consider any evidence other than self-induced intoxication presented in this case, or any lack of evidence that you believe to bear on that element.

¶ 48      During closing arguments, the prosecutor further explained

the self-induced intoxication evidence:

> It's very important to remember that intoxication is not a defense. And you cannot consider whether you believe he was intoxicated as he says he was the first time, second time, and the third time. Each of those times it changed but if you even believe this guy took down 24 cans of beer and a half bottle of Fireball and was up walking around and talking to law enforcement less than two hours later with no problem even if you believe that, you do not get to consider anything about self-induced intoxication as it relates to what he knew.
>
> You cannot come to the conclusion of he was so drunk he didn't know better. He was so

21

drunk he didn't know where his penis was.  He was so drunk he didn't notice that she wasn't consenting.  That is a really important matter of law for you to understand and apply in this case.

. . . .

How do we know though that separate and apart from any question of intoxication, since that can't be considered for knowingly, how do we know that he . . . knew he was intruding and penetrating?  And what I submit to you is that this is the most common sense thing in the entire world.  Right.

. . . .

And we know that he did all of those things because . . . we know that he did those things to get his penis inside her.  So there's no question of whether or not he knew that he was penetrating her.  So I would submit to you that he knowingly inflicted sexual intrusion or sexual penetration.

### 3.    The Court Did Not Err

¶ 49    Drake contends the trial court erred by giving the intoxication instruction, and the prosecution committed misconduct by "arguing that 'self-induced intoxication' could not be considered."  We disagree that the trial court committed error, and we do not review Drake's claim of prosecutorial misconduct because Drake did not develop the argument.

22

¶ 50      "Intoxication of the accused is not a defense to a criminal charge," but, "in any prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant when it is relevant to negative the existence of a specific intent if such intent is an element of the crime charged." § 18-1-804(1), C.R.S. 2024.  Offenses "in which the mental culpability requirement is expressed as 'intentionally' or 'with intent' are declared to be specific intent offenses," § 18-1-501(5), C.R.S. 2024, and offenses "in which the mental culpability requirement is expressed as 'knowingly' or 'willfully' are declared to be general intent crimes," § 18-1-501(6).

¶ 51      Drake was charged with sexual assault, which has a mental culpability requirement of "knowingly," § 18-3-402(1), C.R.S. 2021; thus, Drake was charged with a general intent crime, *see* § 18-1-501(6).  It is "the settled law of [Colorado] that evidence of self-induced intoxication is not admissible to negate the culpability element of 'knowingly.'"  *Stone*, ¶ 5, 471 P.3d at 1151 (quoting *People v. Aragon*, 653 P.2d 715, 719 (Colo. 1982)).

¶ 52      Drake asserts that the trial court erred by giving the intoxication instruction because such instruction erroneously

"create[d] an evidentiary rule that categorically prohibit[ed] [the] jury from considering evidence that [was] both relevant and exculpatory." He argues that a proper intoxication instruction would have explained section 18-1-804(1) to the jury and informed it that such statute merely "re-define[d] the mental state of criminal liability in certain circumstances." We disagree.

¶ 53 Section 18-1-804(1) says that "a defendant may introduce evidence of voluntary, self-induced intoxication to 'negative the existence' of specific intent." *Stone*, ¶ 4, 471 P.3d at 1151 (quoting § 18-1-804(1)). Still, "voluntary intoxication is not an affirmative defense completely absolving a defendant of criminal liability." *Brown v. People*, 239 P.3d 764, 769 (Colo. 2010); *see also People v. Garcia*, 113 P.3d 775, 780 n.4 (Colo. 2005); *Stone*, ¶ 4, 471 P.3d at 1151. "As a result, the introduction of such evidence establishes only a partial defense." *Stone*, ¶ 4, 471 P.3d at 1151. Moreover, "[v]oluntary intoxication is not a true element-negating defense because it is possible for an intoxicated person to form specific intent." *Id.* (quoting *People v. Lara*, 224 P.3d 388, 394 n.4 (Colo. App. 2009)).

24

¶ 54    Drake relies on *Hendershott v. People*, 653 P.2d 385 (Colo. 1982), to assert that "a statute which renders evidence relevant for one purpose — a defense to specific intent — does not render it otherwise wholly irrelevant for the jury's consideration." We disagree with Drake's application of *Hendershott*. *See Hendershott*, 653 P.2d at 388 (concluding that the trial court erroneously precluded the defendant from presenting any mental impairment evidence and, therefore, reversing the defendant's conviction).

¶ 55    In *Hendershott*, the trial court did not allow the jury to consider the defendant's mental impairment evidence. *Id.* However, in this case, the trial court not only permitted the jury to hear evidence on Drake's self-induced intoxication but also provided a jury instruction that explained how the jury must consider such evidence in a legally permissible way.

¶ 56    It is "the settled law of [Colorado] that evidence of self-induced intoxication is not admissible to negate the culpability element of 'knowingly.'" *Stone*, ¶ 5, 471 P.3d at 1151 (quoting *Aragon*, 653 P.2d at 719). Thus, the intoxication instruction correctly informed the jury that it could not consider Drake's self-induced intoxication evidence to negate Drake's general intent of "knowingly."

¶ 57    In sum, we disagree with Drake's contention that the intoxication instruction was "overly broad and prejudicial." We conclude that the intoxication instruction accurately reflected the law concerning self-induced intoxication evidence for general intent crimes. Thus, the trial court did not err by giving the intoxication instruction.

¶ 58    Drake also contends that the prosecutor committed misconduct during closing arguments by telling the jury not to consider "anything about self-induced intoxication as it relate[d] to what [Drake] knew." On appeal, Drake does not sufficiently address his prosecutorial misconduct argument. He limits the presentation of this issue to quoting the prosecutor's argument and citing a case for the proposition that misstating the law is improper. Because we have decided that the trial court's instruction on intoxication was not improper, and Drake does not further develop his contention regarding prosecutorial misconduct, we decline to review this argument further. *See People v. Larsen*, 2023 COA 28, ¶ 26, 532 P.3d 387, 393 (concluding that the defendant's argument was conclusory and not reviewable on appeal because his contention was without explanation or legal citation); *People v. Wallin*, 167 P.3d

183, 187 (Colo. App. 2007) (determining that the defendant's issues were presented in "a perfunctory or conclusory manner" and declining to review such issues).

## D. Cumulative Error

¶ 59    "A cumulative error analysis aggregates all trial errors that individually have been found harmless, and therefore not reversible, and analyzes whether their cumulative effect is such that they can no longer be deemed harmless." *People v. Clark*, 214 P.3d 531, 543 (Colo. App. 2009), *aff'd on other grounds*, 232 P.3d 1287 (Colo. 2010).  Because we have found that the trial court did not err, there is no cumulative error.

## III.    Disposition

¶ 60    The judgment of conviction is affirmed.

JUDGE PAWAR and JUDGE LUM concur.